**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jearold Kenneth WILLIAMS, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**George ALLEN, Defendant–Appellant.**

**Nos. 91–30298, 91–30299.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 1992.

Decided March 22, 1993.

Jay F. Lansing, Moses Law Firm, Billings, MT, Charles W. Elliott, Lozow Law Firm, Denver, CO, for defendants-appellants.

James E. Seykora, Asst. U.S. Atty., Billings, MT, for plaintiff-appellee.

Before: WRIGHT, FLETCHER and CANBY, Circuit Judges.

FLETCHER, Circuit Judge:

Jearold Williams and George Allen appeal, on various grounds, their convictions for conspiracy to manufacture and distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2, possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and unlawful possession of essential chemicals in violation of 21 U.S.C. §§ 841(d)(1), 802(33) and 802(35) and 18 U.S.C. § 2. Williams and Allen also contend that the district court misapplied the Sentencing Guidelines. We affirm the convictions and sentences.

## I. FACTS AND PROCEDURAL HISTORY

On November 24, 1990, the day after Jearold Williams shot and killed his adopted son, Mark Reitler, Glen Reitler, Mark's brother, confided to police that a trailer containing a methamphetamine lab which belonged to George Allen was stored on Williams' property in Fromberg, Montana. Glen, who admitted to having used drugs in the past, also told police that he had seen methamphetamine, or "crank," in the master bedroom of Williams' trailer home on the same property. Relying on this information, DEA agent Keith Aller obtained a search warrant for the Fromberg property, which was executed with help from state authorities. Because Glen had told police he was concerned for his safety, the affidavit supporting the warrant referred to him as "confidential informant" and did not explain his relationship to Williams.

Police seized 157 grams of methamphetamine and over a kilogram of marijuana from Williams' bedroom in the house trailer. A search of a second trailer on the property, which was padlocked and had to be forced open, uncovered glassware and supplies for a methamphetamine lab, including many of the chemicals required to manufacture methamphetamine. The glassware was wrapped in a Denver, Colorado newspaper, and a recent receipt from a Denver convenience store was found in a box in the trailer.

Agents forwarded the padlock that had been removed from the lab trailer to Denver, where DEA agents obtained a search warrant for the home of George Allen.

They based their application on the evidence seized from the trailers on Williams' property and the information supplied by Glen Reitler. In Allen's house agents found a small scale and $8900 in cash. Allen consented to a search of his pickup truck, where agents discovered two keys that fit the padlock.

A grand jury returned an indictment against Williams and Allen charging violations of federal narcotics statutes. Both defendants pleaded not guilty. Prior to trial, Allen moved to suppress the evidence seized at his residence and to sever the trial. The court denied these motions, although it was agreed that the government would "stay away" from the underlying homicide—the subject of pending state charges against Williams—so as not to prejudice Allen. During trial, the court ruled admissible under rule 404(b) the testimony of a government witness, Larry Dreier, regarding drug transactions with Williams and Allen that fell outside the charged conspiracy. The court issued a cautionary instruction that the jury could not consider the testimony as evidence of Allen's character to engage in drug dealing. The instruction did not refer to Williams, however. Finally, at the close of trial, the court ruled that a number of incriminating, out-of-court declarations made by Williams and Mark Reitler to which various witnesses at trial had testified were admissible as statements "in furtherance of" the conspiracy.

Williams and Allen were convicted on all counts of the indictment and each was sentenced to 151 months in prison.

## II. SEARCH WARRANTS

Both Williams and Allen challenge the validity of the warrants pursuant to which agents conducted the searches in Montana and Colorado. They contend primarily that the warrants were defective because the affidavits supporting them did not state that the informant was the brother of the recently deceased Mark Reitler, a fact which they assert would have affected the

issuing officials' determination of probable cause.

■ We review a court's issuance of a search warrant for clear error and will uphold the warrant so long as the court had a "substantial basis" for concluding that the totality of the circumstances established probable cause. *United States v. Bertrand*, 926 F.2d 838, 841 (9th Cir.1991). A defendant can challenge a facially valid warrant when it contains deliberate or reckless omissions of facts that tend to mislead. *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir.), *cert. denied*, 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 331 (1988). Whether false statements or omissions are intentional or reckless is a factual finding reviewed under the clearly erroneous standard. *Id.*

■ The district court did not err in denying the motions for suppression. During the investigation of the homicide, several witnesses related that Mark Reitler had been heard arguing with Williams over a drug debt shortly before he was killed. Glen, whose identity was known to the police, was able to supply specific information about Williams' drug activities to the authorities, including the source and exact location and packaging of the methamphetamine in Williams' trailer. Glen's credibility as an informant was enhanced by his admission that he had used methamphetamine in the past. These facts, taken together, provided a substantial basis for the Montana warrant.

The Colorado warrant was based on the information from Glen. His reliability had been confirmed by the Montana search. The agents also had evidence discovered in the lab trailer which, consistent with Glen's story, indicated that it had recently arrived from Colorado. The totality of these circumstances amply supported the Colorado magistrate's finding of probable cause.[1]

None of the information in the supporting affidavits has been shown to be untrue. Nor is there any reason to believe that the warrants would not have been issued had

---

**1.** Allen consented to the search of his pickup, where the most damaging piece of evidence against him, the ring with keys to the padlock, was discovered.

Glen's identity as Mark's brother been known to the issuing officials. It was apparent from the information he supplied that Glen was an associate of Williams and involved to some extent in illegal drugs. As was noted by this court in *United States v. Strifler*, 851 F.2d 1197, 1201 (9th Cir.1988), *cert. denied*, 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989), "[i]t would have to be a very naive magistrate who would suppose that a confidential informant would drop in off the street with such detailed evidence and not have an ulterior motive. The magistrate would naturally have assumed that the informant was not a disinterested citizen." We conclude that the court did not err in holding that the failure to disclose Glen's identity did not render the affidavits misleading.

## III. HEARSAY

■ Appellants argue that the district court erred in admitting various witnesses' testimony recounting statements made by Williams and Mark Reitler concerning their drug activities.[2] The court ruled all of the challenged testimony admissible as nonhearsay under Fed.R.Evid. 801(d)(2)(E). The trial court's decision that the statements fell within the coconspirator hearsay exception must be upheld unless clearly erroneous. *United States v. Andersson*, 813 F.2d 1450, 1456 (9th Cir.1987). We will not reject the district court's factual findings unless we are " 'left with the definite and firm conviction that a mistake has been made.' " *United States v. Zavala–Serra*, 853 F.2d 1512, 1515 (9th Cir.1988).

■ We address first the statements made by Mark Reitler before his death concerning his drug-related activities. These came in through the testimony of Glen Reitler; Sandy Schillinger, Mark's live-in girlfriend; and Fred Winters, a friend of Mark's. They included:

1. Mark told Glen he wanted to borrow $1,000 from Glen to obtain marijuana from Williams. (Reporter's Transcript ("R.T.") at 606.)

2. Mark told Glen that Williams was going to Colorado to get marijuana from George Allen. (*Id.* at 609–10.)

3. Mark told Glen he was going to Denver with Williams to look for "the stuff." (*Id.* at 618.)

4. Mark told Glen that Williams and Allen would be taking a trip to look for a chemical with which to make crank. (*Id.* at 619–20.)

5. Mark asked Winters if he would like to buy some crank. (*Id.* at 679.)

6. Mark told Schillinger that he was angry with Williams because Williams hadn't treated him like a "partner." (*Id.* at 755.)

■ In ruling the above statements admissible, the district court did not explicitly find that Mark Reitler was a member of the Williams/Allen drug conspiracy, but such a finding is implicit in its determination that the statements could come in as statements in furtherance of the conspiracy. An individual need not be indicted to be considered a coconspirator for the purposes of rule 801(d)(2)(E). *United States v. Everett*, 692 F.2d 596, 601 (9th Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930, *and cert. denied*, 460 U.S. 1053, 103 S.Ct. 1502, 75 L.Ed.2d 932 (1983).

There can be no doubt that Mark was a participant in the conspiracy. Mark was killed in a dispute with Williams over drug monies. At trial, his girlfriend described the drug business he ran from their home, and named Williams as Mark's supplier. The alleged hearsay statements themselves are additional proof of Mark's participation in the conspiracy. *See United States v. Bourjaily*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987) (court can examine contested statements in determining whether a conspiracy existed for purposes of rule 801(d)(2)(E)).

Glen was also shown to have participated in the conspiracy. At trial he admitted to having used crank and marijuana that he had obtained from his brother and Williams. He further testified that he had given $1,000 to his brother to "invest" in

---

**2.** Williams challenges only the out-of-court statements of Mark Reitler.

marijuana which he knew was to be procured by Williams from Allen, and that he expected to receive marijuana as a return on the investment. Glen, a coventurer in at least one facet of the drug enterprise that was being supplied by Williams and Allen, is also properly considered a coconspirator.

 In determining whether a statement is made "in furtherance of" a conspiracy, the court looks to the declarant's intent in making the statement, not the actual effect of the statement. *United States v. Zavala–Serra*, 853 F.2d 1512, 1516 (9th Cir.1988). It is not necessary that the statement be made to another member of the conspiracy for it to come under rule 801(d)(2)(E). *Id.* To be "in furtherance" a statement must advance a common objective of the conspiracy or set in motion a transaction that is an integral part of the conspiracy. *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir.), *cert. denied*, 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988). Although mere conversations or narrative declarations between coconspirators are not in themselves sufficient to invoke the exception to the hearsay rule, statements made to keep coconspirators abreast of an ongoing conspiracy's activities satisfy the "in furtherance of" requirement. *Id.* at 1535–36.

The first four of the challenged statements were clearly designed to keep Glen informed as to the conspiracy's activities. The fifth statement, though not made to a coconspirator, represented an attempt by Mark to set a transaction in motion that was integral to the conspiracy, namely, a drug sale. These five statements were admissible under rule 801(d)(2)(E).

 The sixth statement was not correctly admitted as a statement in furtherance of the conspiracy. Although Schillinger knew of her boyfriend's drug dealing, the record does not support a finding that she was a coconspirator. Nor can it be said that the statement, which was essentially an expression of frustration to a confidante, was an attempt to further an objective of the drug conspiracy or set a transaction in motion.

 We may, however, affirm the admission of the sixth statement if an alternative theory would have justified its admission. *United States v. Nazemian*, 948 F.2d 522, 530 (9th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992). Mark's acknowledgment of his partnership with Allen in a drug business was a declaration against his penal interest. When offered as inculpatory evidence, such a statement is admissible as a hearsay exception under rule 804(b)(3) of the Federal Rules of Evidence if 1) the declarant is unavailable; and 2) the statement tends to subject the declarant to criminal liability such that a reasonable person in the declarant's position would not have made it unless he or she believed it to be true. Our court has yet to resolve whether the rule that exculpatory statements require corroborating evidence also applies to inculpatory statements. *Id.* at 530; *see also United States v. Layton*, 720 F.2d 548, 559 (9th Cir.1983), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984).

Because he was deceased at the time of trial, Mark was clearly unavailable. The statement also meets the second "against interest" criterion because it "solidly inculpates" Mark, *see Nazemian*, 948 F.2d at 530; it was a clear admission of his participation in the drug conspiracy. There is no indication that Mark had any motive in acknowledging his partnership with Williams other than to express his indignation to his girlfriend, so the statement has the ring of truth. Finally, without deciding the applicability of the third requirement of corroborating circumstances, we note that there was abundant additional evidence indicating that it was no secret among Mark's family and friends that he was in the drug business with Williams.

 The second group of challenged statements were statements of Williams introduced through the testimony of Glen Reitler; Schillinger; Winters; and David Wood, an associate of Williams, Allen, and

Mark Reitler:[3]

7. Williams told Glen that he went to Colorado and got marijuana from Allen. (R.T. at 612.)

8. Williams told Glen he had a lab he was storing for Allen. (*Id.* at 621.)

9. Williams told Glen he was storing a trailer for Allen. (*Id.*)

10. Williams told Glen that the six ounces of crank he had belonged to Allen. (*Id.* at 624.)

11. Williams told Schillinger not to say anything about his trip to Denver. (*Id.* at 754.)

12. Williams told Schillinger that he was supposed to be getting a lab which would be hidden away for awhile. (*Id.* at 757.)

13. Williams told Schillinger that there was a trailer on his property that he was watching for a friend. (*Id.* at 756.)

14. In Schillinger's presence, Williams stated that Allen had left something on Williams' property and had changed the lock on Williams' gate because he didn't want anybody to see what he had left or get into it. (*Id.* at 758.)

15. Williams told Schillinger that the reason he needed money from Mark was because he was "meeting a man" the next day. (*Id.* at 758.)

16. Williams told Winters that he had some crank for Mark to sell. (*Id.* at 677.)

17. Williams told Winters that the trailer belonged to a friend and that's all Winters needed to know. (*Id.* at 684.)

18. Williams told Winters that the trailer belonged to a friend from Colorado and he was storing it. (*Id.* at 685.)

19. Williams told Winters that the trailer was a crank lab. (*Id.* at 685.)

20. Williams told Wood that he knew who put the lock on the gate and that it was done because a trailer belonging to Allen was on the property. (R.T. at 509.)

21. Williams told Wood that he needed money because Allen was coming into town the next day. (R.T. at 520.)

Statements 7 through 10 were admissible as statements of a coconspirator in furtherance of the conspiracy. Williams' explanations regarding the source of the marijuana and methamphetamine and the presence of the lab trailer served to keep Glen, a coconspirator, informed as to the group's drug supply and were therefore in furtherance of the conspiracy.

▆▆▆▆ The district court did not err in admitting statement 11. Williams' admonition to Schillinger not to tell anyone about the trip he took to Denver to obtain drugs from Allen represented an effort to conceal the conspirators' illegal activities, and thus was in furtherance of those activities. Statement 16, an attempt by Williams to solicit one of Mark's regular drug customers, also furthered a primary objective of the conspiracy—to sell drugs—and was admissible for that reason.

As discussed above, Schillinger was not shown to be a coconspirator. Similarly, although they were consumers of drugs supplied through Mark, there was no evidence that either Winters or Wood had an interest in the drug-selling enterprise. Because the remainder of the statements listed above were narrative declarations by Williams to one of these three parties and cannot be said to have advanced the goals of the conspiracy, they were hearsay and the district court erred in admitting them as to Allen.[4] We therefore consider whether the error was harmless.

▆▆▆ Statements 12 through 14 and 17 through 20 all concerned the fact that Williams was storing a lab trailer for Allen. Since Williams' virtually identical statements to Glen (8 and 9) were admissible, the erroneously admitted declarations made

---

**3.** In addition to the statements listed below, Allen challenges Wood's testimony that the reason he travelled to Denver with Williams was "to party [and] relax" and pick up pot. (R.T. at 486.) Since Wood was relating facts within his own knowledge and not repeating an out-of-court statement, this testimony was not hearsay. *See* Fed.R.Evid. 801(c) (definition of hearsay).

**4.** As noted above, Williams does not contest these statements. *See supra* note 2. They were admissible against him under Fed.R.Evid. 801(d)(2) as admissions of a party-opponent.

to Schillinger, Winters and Wood to the same effect were cumulative and harmless.

 Statement 21, and presumably statement 15, related to Williams' needing money because he was to meet Allen the next day. Glen Reitler also testified, without objection, that Williams told him he needed to "pay ... off" Allen, (R.T. at 625), and the record is replete with additional evidence of the business relationship that existed between Williams and Allen. We conclude that the admission of these two final statements was harmless as well.

## IV. DREIER'S TESTIMONY

Larry Dreier, who had been arrested for distribution of cocaine, testified pursuant to a plea agreement about obtaining quantities of cocaine and crank from Allen both prior to and during the period of the conspiracy, charged as July through December of 1990. Dreier also described how he met Williams through Allen late in the summer of 1990 when purchasing cocaine and saw Williams again when he returned some bad crank to Allen in Casper, Wyoming. Dreier testified that he spoke with Allen about repayment for the bad crank on numerous occasions during the fall of 1990. A few weeks before he was arrested, Williams attempted to deliver six ounces of crank to Dreier at Dreier's residence.

 Williams and Allen object that Dreier's testimony was improperly admitted because the trial court did not adequately weigh the prejudicial effects of admitting evidence of transactions that predated the charged conspiracy as well as uncharged cocaine transactions. Whether the testimony was "other crimes" evidence within the meaning of rule 404(b) is a question of law we review *de novo*. *United States v. Soliman*, 813 F.2d 277, 278 (9th Cir.1987). If it was "other crimes" evidence, we review the district court's decision to admit it for abuse of discretion. *United States v. Mundi*, 892 F.2d 817, 820 (9th Cir.1989), *cert. denied*, 498 U.S. 1119, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991).

 Evidence should not be considered "other crimes" evidence when " 'the evidence concerning the ["other"] act and the evidence concerning the crime charged are inextricably intertwined.' " *Soliman*, 813 F.2d at 279 (quoting *United States v. Aleman*, 592 F.2d 881, 885 (5th Cir.1979)) (alteration in original). The policies underlying rule 404(b) are inapplicable when offenses committed as part of a "single criminal episode" become other acts simply because the defendant "is indicted for less than all of his actions." *Id.*

 The uncharged transactions with Allen and later Williams to which Dreier testified were closely linked to the events charged in the Williams/Allen drug conspiracy. Dreier was an established cocaine customer of Allen who began purchasing crank from the conspirators in July 1990 in addition to the usual cocaine. This represented an important development in the Williams/Allen conspiracy; Dreier was a fairly substantial outlet for drugs since he himself was a distributor. Dreier's brief testimony regarding earlier cocaine transactions focused mainly on his and Allen's usual mode of doing business at a motel in Casper. It was during such a transaction that Dreier met Williams.

 In view of these facts, Dreier's testimony regarding uncharged conduct was inextricable from and provided necessary context for Dreier's testimony about the charged conduct. Even if portions of Dreier's testimony could be categorized as "other crimes" evidence, the district court would not have abused its discretion in admitting it. The additional acts predating the conspiracy pertained to Allen only, and the court issued a cautionary instruction as to Allen. As for uncharged cocaine transactions with Dreier during the conspiracy period, because they were linked to and essentially part of the same conduct as the crank sales, Dreier's references to them during his testimony were not unfairly prejudicial.

## V. SEVERANCE

Allen contends that the trial should have been severed because he was prejudiced by the admission of coconspirator statements

and by references to the pending homicide charge against Williams. He claims that he was deprived of his right to present an individual defense and that the jury was unable to evaluate separately the evidence against him.

■■■■ Denial of a motion for severance rests within the sound discretion of the trial court. *United States v. Smith,* 893 F.2d 1573, 1581 (9th Cir.1990). "The general rule is that persons jointly indicted should be jointly tried." *Id.* In order to obtain a reversal, Allen must show that the joint trial "was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *United States v. Abushi,* 682 F.2d 1289, 1296 (9th Cir.1982).

Our analysis of the admissibility and effect of the alleged hearsay testimony disposes of the first of Allen's concerns. Much of the challenged testimony, including many of Williams' statements, was properly admitted against Allen as well as Williams. That which was not we have held to be harmless error.

During the trial, the prosecutor made a half dozen or so passing references to the shooting of Mark Reitler, generally referring to it as an "incident" or "altercation." Allen fails to demonstrate that these incidental references to the underlying homicide were manifestly prejudicial. At no time did the government dwell on the shooting or attempt to use it against Allen. Allen himself referred to the homicide at least three times during his cross-examination of government witnesses.

Nor does Allen substantiate his contention that he was unable to present an individual defense. Allen's defense, like Williams', was essentially that the evidence was insufficient to show his involvement in a conspiracy to manufacture and distribute drugs. Williams' defense strategy did not prejudice Allen. *See Zafiro v. United States,* —— U.S. ——, —— – ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993).

Finally, Allen's claim that the jury could not separately evaluate the evidence against him is without merit. Allen was charged with the same offenses as Williams; almost all of the evidence admitted in the joint trial would have been admissible against Allen in a separate trial. The jury was instructed to consider the evidence against Williams and Allen separately, and reminded that Williams and Allen were only being tried for the offenses in the indictment. Allen is not entitled to a new trial on account of his speculation that the jury was unable to follow instructions. *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

## VI. PROSECUTORIAL MISCONDUCT

Allen contends that reversal is warranted due to the prosecutor's conduct during his closing argument. He initially objects to four statements in which the prosecutor expressed his personal opinion of the evidence:

> So you have to make a decision whether or not an agreement was reached. I think there's no question in my mind from the testimony as to these two defendants there is an agreement between the two of them. (R.T. at 1220.)

> The Judge goes on and instructs you in that first instruction on the elements. For conspiracy to have existed it is not necessary for the conspirators to have made a formal agreement. I think you found that. (R.T. at 1220–21.)

> We don't know how they got there. We have a lot of questions that we can't answer. You can't answer either. Ask yourself a question. Do you haul up empty freon cans from Colorado in your lab trailer? I don't think you do. (R.T. at 1224–25.)

> I think if someone really wanted to plant something and hurt Mr. Williams big time, [he] would have done it a little more obvious [sic] than that. (R.T. at 1231.)

■■■■ As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses. *United States v. McKoy,* 771 F.2d 1207, 1210–11 (9th Cir. 1985). Because Allen did not object to any

of the comments at trial, we review the prosecutor's vouching in the context of the entire record to see if it rises to the level of plain error. *United States v. Molina,* 934 F.2d 1440, 1444 (9th Cir.1991). We will reverse only if a miscarriage of justice would otherwise result. *Id.*

■ We do not believe that these remarks, viewed in the context of the eight-day trial, caused any significant prejudice to Allen. In analyzing the effects of a prosecutor's vouching, we look to a number of factors, including: the form of the vouching; the degree of personal opinion asserted; how much the vouching implied that the prosecutor had extra record knowledge of the witness' truthfulness; and the importance of the testimony in the overall context of the case. *United States v. Necoechea,* 986 F.2d 1273, 1278 (9th Cir.1993); *see, e.g., United States v. Kerr,* 981 F.2d 1050, 1053–54 (9th Cir.1992).

While improper, the vouching here functioned mainly as rhetorical emphasis for the inferences the prosecutor was urging the jury to draw rather than a meaningful personal assurance that the defendants were guilty. In light of the substantial evidence supporting the jury's verdict as to Allen, there is no miscarriage of justice if the verdict stands. *Cf. Molina,* 934 F.2d at 1446 (prosecutor's statement that "you can't call 10 or 12 [government] agents ... liars," implying that other agents would have testified at trial, was not plain error in context of entire record).

■ We are more troubled by two additional comments made by the prosecutor during his rebuttal: that the jury should "tell George Allen to take his keys and send them back to Denver" and "[t]ell these defendants that we do not want crank in Montana." (R.T. at 1321.) The transcript also reflects that the prosecutor tossed some keys at Allen as he made the first of these remarks.

■ A prosecutor's appeal to the jury to act as a "conscience of the community" is acceptable unless it is "specifically designed to inflame the jury." *United States v. Lester,* 749 F.2d 1288, 1301 (9th Cir.

1984). Here, the prosecutor's remarks and tossing of keys were clearly improper because they were an attempt to capitalize on whatever parochial inclinations the jurors might have, particularly with respect to Allen, an out-of-state defendant. Because Allen objected to the prosecutor's conduct at the time, we review for harmless error. *United States v. Sherlock,* 962 F.2d 1349, 1364 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). Under this standard, we must decide whether the conduct, considered in the context of the entire trial, affected the jury's ability to judge the evidence fairly. *Id.*

While we do not condone it, we do not believe that the prosecutor's behavior warrants reversal in this case. We have reviewed the entire transcript for additional instances in which the prosecutor made remarks of a similar nature and have found none. The conduct was unfortunate, but isolated. Moreover, the jury was instructed by the court that it was not to consider the statements and arguments of counsel as evidence in the case. Under these circumstances, we do not believe the jury's ability to weigh the evidence impartially was materially affected. *Cf. United States v. Polizzi,* 801 F.2d 1543, 1558 (9th Cir.1986) (harmless error where prosecutor told jury to "finish the job that the F.B.I. started" and "go after" the two defendants but did not go on at length).

## VII. SENTENCING

Williams and Allen contend that the court misapplied the Sentencing Guidelines. They argue that the amount of methamphetamine for which they are being held responsible exceeds the scale of their actual offense. They claim that they could not "reasonably have foreseen" the amount of methamphetamine the lab was capable of producing, especially in view of the fact that certain essential chemicals were missing or not present in significant quantities.

■ Section 2D1.4(a) of the Sentencing Guidelines permits the trial judge to sentence a defendant convicted of a conspiracy involving a controlled substance as if the object of the conspiracy had been complet-

ed. Application note 2 to this section provides that where "the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider ... the size or capability of any laboratory involved." The trial court adopted the findings of the probation officer in the presentencing reports, which were based in turn on expert testimony at trial about the potential output of the methamphetamine lab, that the conspirators were capable of producing nine kilograms of methamphetamine. The nine kilogram lab potential, together with the 157 grams of methamphetamine actually seized, resulted in a base offense level of 34. In sentencing Williams, the court noted that there was "no question at all that that meth lab was on your property and that that meth lab had extreme capabilities of producing a tremendous amount of methamphetamine." (R.T. of 8/1/91 at 41.)

 The capability of a drug operation is an issue of fact reviewed for clear error, so we will not reject the district court's findings unless we are firmly convinced that a mistake has been made. *United States v. Upshaw*, 918 F.2d 789, 791 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1335, 113 L.Ed.2d 266 (1991). When the agents searched the trailer, they found

some, though not all, of the chemicals required for the manufacture of methamphetamine. They did, however, find enough glassware and accoutrements to indicate that the lab was a sophisticated one. Indeed, the exegesis of the glassware took up a significant portion of the government's case.

Fred Steinhauer, the government forensic chemist on whose testimony the probation officer relied in making the determination as to lab capability, explained in some detail at trial how he arrived at various estimates of the potential output of the lab from the glassware and essential chemicals that were found. In rendering these estimates, Steinhauer assumed the availability of the chemicals that were missing or in short supply. The array of glassware and chemicals discovered indicated that the conspirators used more than one method and manufactured more than one type of methamphetamine.[5] The defendants did not offer their own expert to challenge Steinhauer's testimony.

This court has held that the absence of a required chemical does not preclude a finding of lab capability that is based on an assumption that the missing chemical could have been obtained. *United States v. Bertrand*, 926 F.2d 838, 846–47 (9th Cir.1991). Under the guideline commentary to section

---

5. As summarized in the presentencing reports for Williams and Allen, Steinhauer calculated potential outputs from different possible methamphetamine "recipes" as follows:

Using one 22 liter reaction flask, based upon the capacity of one 22 liter flask in a P2P reaction, yields approximately 2700 grams of P2P.

The capacity of a 22 liter reaction vessel, using the methyl means/P2P reaction, yields approximately 3 kilograms of dl-methamphetamine hydrochloride.

Using one 22 liter reaction flask, the ephedrine/red phosphorous/hi reaction yields approximately 3 kilograms of d-methamphetamine hydrochloride.

Based upon the amount of acetic anhydride found, one could produce 4 kilograms of P2P assuming other chemicals necessary for that reaction were available. Using these 4 kilograms of P2P one would then obtain 4 kilograms of methamphetamine hydrochloride assuming other chemicals necessary for that reaction were available.

There was enough methylamine at the lab site to make 6 kilograms of dl-methamphetamine hydrochloride assuming the other chemicals in that reaction were present.

There was enough hydriodic acid found at the Fromberg site to make 3 kilograms of d-methamphetamine hydrochloride assuming the other chemicals were available.

Although there were trace amounts of red phosphorous found, if the 500–gram bottle were full, there would be enough red phosphorous to make approximately 3–3/4 kilograms of d-methamphetamine hydrochloride. (Allen Presentence Report at 5; Williams Presentence Report at 5.) Thus, certain of the ingredients for different recipes, each yielding 3 or more kilograms if "cooked" in a 22–liter flask, were present. Because at least three 22–liter flasks were seized, the probation officer determined the lab capability to be 9 kilograms. (Allen Presentence Report at 7–8; Williams Presentence Report at 7–8.)

2D1.4(a), "the relevant consideration [is] not probable success but whether the conspiracy was capable of producing the amount in question." *United States v. Monroe*, 943 F.2d 1007, 1019 (9th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1585, 118 L.Ed.2d 304 (1992). The extrapolation relied on by the government and accepted by the district court was a reasonable one based on evidence of a very well-equipped methamphetamine lab. We also note that there was evidence that the conspirators intended to secure the missing substances; Mark told Glen, for example, that Williams and Allen were planning a trip to look for a chemical needed to make crank. Under these circumstances, we see no reason to disturb the trial court's factual finding that the conspirators were capable of producing nine kilograms of methamphetamine.

■ Allen additionally claims he was unfairly denied a two-point downward departure for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The presentence report recommended granting such a downward departure based on a letter from Allen's lawyer which was submitted to the probation officer on Allen's behalf and which purported to "acknowledge" Allen's acceptance of responsibility. We review for clear error the district court's determination whether a defendant has accepted responsibility. *United States v. Rosales*, 917 F.2d 1220, 1222 (9th Cir.1990).

■ The sole statement made by Allen himself that touched upon responsibility for his actions came during sentencing when he informed the judge that he had been a hard worker all his life, that he loved his twelve-year-old daughter, and that "ten years is a long time for a man to sit and watch his life waste away." (R.T. of 8/1/91 at 14–15.) The district court was justified in finding that this statement and the equivocal letter from Allen's attorney represented an insufficient showing of contribution to merit the reduction.

The convictions and sentences are AFFIRMED.