**UNITED STATES of America, Plaintiff,**

v.

**Michael J. RUIZ, Defendant.**

**No. 92–10075–01.**

United States District Court,
D. Kansas.

May 28, 1993.

David Lind, Asst. U.S. Atty., Wichita, KS, for plaintiff.

Charles O'Hara of O'Hara, O'Hara & Tousley, Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, Chief Judge.

The indictment charges defendant Michael Ruiz with one count of possession of marijuana with the intent to distribute in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2, and one count of the use or carrying of firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Ruiz has now moved to suppress evidence obtained by the government during searches of a residence located at 1428 South Sedgwick Street, and a storage unit located at 3440 West Douglas, in Wichita, Kansas.

Both searches were made pursuant to warrant on August 26, 1992. The residence on Sedgwick Street is a one-story single family house with a detached garage. The storage unit is located on a lot containing a number of similar units which are rented to customers. Ruiz contends that the searches of the residence and the storage shed were unconstitutional. The search of the storage unit, Ruiz argues, is invalid as a fruit of the initial improper search of the residence.

The application for search warrant for the search of the residence was signed by United States Magistrate Judge John Wooley on August 21, 1992. The affidavit attached to the application for search warrant was prepared by Detective Robert Benton of the Sedgwick County Sheriff's Department.

The first portion of the affidavit consists of general statements relating to the common financial and record-keeping practices of drug traffickers. The remainder of the affidavit details information which Benton had obtained purporting to connect a "Mike Ruiz" with the traffic in cocaine and marijuana. To summarize this portion of the affida-

vit, Benton states that in June of 1991 he and another detective had met with a confidential informant, SIL–91–X018, who stated that he had known Mike Ruiz for seven years, and that Ruiz had distributed over a ton of marijuana during that period. The informant stated that in April of 1991 he had sold Ruiz one hundred pounds of marijuana for $150,-000.00 in cash.

According to SIL–91–X018, Vasquez would deliver marijuana and cocaine to Smith. Smith would then contact Ruiz at his residence. Ruiz would then give Smith the money to purchase the drugs from Vasquez. The informant stated that Ruiz has never worked, he only sells marijuana, he always pays for everything with cash, he uses a pager to arrange his drug deals, and "has a storage shed that he uses to conceal scales that are used to weigh the marijuana."

In October of 1991, SIL–91–X018 told Benton that Ruiz had told him Ruiz had had a partner in the marijuana business who died about three years before. Ruiz told the informant that his partner had left $187,000.00 to Ruiz to hold for him for a pending drug deal. Ruiz also told the informant that his former partner also had several hundred thousand dollars in a number of safety deposit boxes which he maintained under false names.

Also during the previous year, another informant told law enforcement officers that Mike Ruiz operated as a marijuana dealer; that he lived in "a real nice house," although he had no known job.

During March of 1991, Benton and a third detective spoke to a third confidential informant. According to his informant, Ruiz bought 100 pounds of marijuana at a time, and he owned several vehicles, including a truck, a Corvette, and a Mercedes–Benz. The informant told the officers he had bought a lot of "dope" from Ruiz, and he had never known Ruiz to have a job.

On May 28, 1992, law enforcement officers arrested Smith and Vasquez as they attempt-ed to pick up 100 pounds of marijuana and one kilogram of cocaine. After his arrest, Vasquez spoke to Detective Benton. Vasquez stated that he had delivered cocaine and marijuana to Smith on several previous occasions. Vasquez told Benton that Smith acted as the middle man in these transactions. He said he had seen the "money-man" on two of these occasions. He described this third man as a white male, 6′ tall, about 180 pounds, with long dark hair and driving a dark-colored Bronco II or Blazer. Vasquez identified Ruiz as this money-man.

On July 21, 1992, Detective Benton learned that a safety deposit box at Bank IV in Wichita had been discovered which contained $100,000.00 in cash, along with gold and diamond jewelry. Information contained in the box identified it as belonging to Ruiz's dead partner, John Beck.

Benton contacted the Kansas Department of Revenue on August 12, 1992 and learned that Ruiz had not filed an income tax return during the previous four or five years. Two days later, Benton found that the utility and property tax records for the address at 1428 South Sedgwick "are under two different names."[1]

On August 18, Benton met with another confidential informant. The informant stated that Ruiz was a large-scale marijuana dealer, and had never had any other employment. The informant stated that Ruiz and Beck had been marijuana dealers together.

The affidavit then states in paragraph 15:

On August 18, 1992 affiant observed as SIL–91–X018 arrived at 1428 South Sedgwick, Wichita Kansas. Inside the residence SIL–91–X018 observed a phone bill on the couch in the living room and a stack of miscellaneous documents on a table underneath the telephone. Ruiz told SIL–91–X018 that he had just returned from his storage shed and would be returning to the shed in a week or two.

---

**1.** The affidavit does not state whether this meant that the names were simply different from each other (one of which may have been Ruiz), or that the names were different from each other and different from Ruiz. At the hearing on the defen-dant's motion, Detective Benton testified that the property tax was listed under the name of Kim Jemmerson, while the Kansas Gas & Electric records listed a Robin Diehl.

The warrant obtained pursuant to this application was executed at 10:15 a.m. on August 26, 1992. Inside the house, officers seized unidentified amounts of United States and foreign money, marijuana, and valium. Among the many items seized pursuant to the warrant were various documents, video tapes, photographs, glass vials, a scale, two firearms, and a crossbow.

The next day, law enforcement officers obtained a warrant for the search of a rented storage unit. The affidavit filed with the application for this warrant, also completed by Detective Benton, repeats the information contained in the previous affidavit, with the additional statement that Benton had discovered 130 pounds of marijuana and $49,000.00 in U.S. currency in the house on South Sedgwick, as well as documents showing that Ruiz rented a storage unit at 3440 West Douglas. The affidavit further states that two detectives had spoken with the manager of the storage facility, who told them that Ruiz and a Marty Thompson rented storage unit G-3, that the rent for the unit was several days overdue, and that the unit had been padlocked until the rent was paid.

The affidavit states that at about 5:30 p.m. on August 26, the defendant's girlfriend, Debra Schrauner, had been seen driving by the storage facility without stopping. Benton spoke with Schrauner a few hours later. Schrauner stated that Ruiz rented a storage shed but that she did not know where it was located. The affidavit states that Benton spoke with Marty Thompson the next morning, and that Thompson refused Benton's request to search the storage unit.

The warrant was executed early that evening. The return states that officers discovered a shotgun and unstated amounts of marijuana and currency in the storage shed.

On May 25, 1993, the court heard arguments relating to Ruiz's motion to suppress. In his motion, Ruiz argues variously that the warrant was overbroad, that it was based on stale information, and that the application for the warrant did not represent probable cause sufficient for a warrant to issue.

The warrant for the search of the residence is a documents warrant which authorizes the seizure of documents, records, papers, books, electronic equipment, jewelry, and photographs of almost every conceivable variety. Ruiz premises his overbreadth argument on the decision of the Tenth Circuit in *United States v. Leary,* 846 F.2d 592, 600 (10th Cir.1988), in which the court held invalid a warrant which allowed law enforcement officers to seize from an export company documents typical of that business, since the warrant therefore essentially contained no limitation at all on the property to be seized.

The warrant certainly authorizes the seizure of a wide variety of information. On the other hand, the court would also note that, in *Leary,* the search was premised on the company's alleged involvement in a single prior transaction involving the illegal export of an electronic device to the People's Republic of China; there was no indication in the application for warrant that the company had no legitimate business. In contrast, in the present case numerous witnesses had informed law enforcement officers that Ruiz had never had any legitimate employment, and that he made his money as a major drug dealer. Any business records which were found at the residence were therefore likely to relate to that drug dealing. However, for reasons which will be addressed below, the court finds it is unnecessary to resolve Ruiz's overbreadth argument.

The court will also reserve any ruling on Ruiz's argument that the warrant was based on "stale" information. Much of the affidavit filed in support of the warrant reflects information obtained by Detective Benton a year prior to the time of the application for the warrant. But it is also clear that much of what was in the warrant was quite recent, such as the visit of SIL–91–X018 to the residence at 1428 South Sedgwick, as well as Vasquez's statements after his arrest implicating Ruiz. And while much of the information given by the informants had been obtained over the course of the previous year, the information is nonetheless consistent, both over time and between the various sources of information.

The court finds that, as with his argument relating to the alleged overbreadth of the warrant, it is unnecessary to determine the

validity of Ruiz's staleness argument. This is because the court finds that the warrant was not issued on probable cause. When shorn of its misleading and incorrect information, the affidavit is clearly insufficient to justify the search of the residence on South Sedgwick. With the suppression of the evidence obtained by that search, the affidavit in support of the search of the storage unit is also clearly lacking in probable cause.

■ In determining whether there is probable cause for the issuance of a warrant, the question for this court is whether the magistrate judge had a substantial basis for determining that, in the light of the totality of the circumstances set forth in the affidavit before him, there was fair probability that contraband or evidence of criminal activity would be found in a given place. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In reviewing an affidavit for a search warrant, a court should view the document "in a common sense, nontechnical manner, with deference to be given in marginal cases to the prior determination of probable cause by the issuing authority." *United States v. Barrera,* 843 F.2d 1576, 1581 (10th Cir.), *cert. denied,* 488 U.S. 859, 109 S.Ct. 153, 102 L.Ed.2d 124 (1988).

■ The Fourth Amendment requires that the magistrate judge who issues a search warrant be provided with information from which he can make an independent evaluation of probable cause. *See Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964). The provision in a warrant affidavit of false or misleading information, information which is known to be false by the affiant or which is provided by the affiant with reckless disregard of the truth, represents an unthinkable intrusion upon the authority of the magistrate judge. *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984); *Franks v. Delaware,* 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978). *See United States v. Williams,* 989 F.2d 1061 (9th Cir. 1993) (invalidating search where warrant application stated that police drug dog had shown an "interest" in package, but affiant knowingly excluded fact that dog had not "alerted" to it); *United States v. DeLeon,* 979 F.2d 761 (9th Cir.1992) (search invalid where application stated that witnesses reportedly had seen marijuana growing on defendant's property, when police knew that witnesses denied seeing marijuana, and only remaining support for warrant was statement of one witness who claimed to have "smelled" the growing marijuana).

■ In the present case, there is very little information in the first affidavit which relates directly to the house at 1428 South Sedgwick. Instead, the vast majority of the affidavit is devoted either to a generalized description of the common behavior of drug dealers or information which generally connects Ruiz with drugs but which has no connection with the house at 1428 South Sedgwick.

Indeed, only two portions of the affidavit make any substantial mention of this particular place. Paragraph 13 of the affidavit states that the property tax and utility records "are under two different names," a state of affairs which is certainly not uncommon, let alone sufficient probable cause to believe there is criminal activity afoot. The only remaining portion of the affidavit which discusses the house at 1428 South Sedgwick is paragraph 15 of the affidavit, which has been previously quoted in full.

The search must stand or fall on the information contained in this paragraph. In reviewing the affidavit for the first time, this court inferred from this paragraph (as no doubt the magistrate judge did also) that there was a connection between the house and Ruiz's dealings in drugs; that indeed he had used the house as a place to meet with his companions in the drug business and there discuss his illegal operations. This inference, the court has discovered, is incorrect.

During the hearing on the present matter, the court heard the testimony of Detective Benton. From this testimony, the court learned that contrary to the impression left by the affidavit, Detective Benton did not simply "observe" the confidential informant meet with Ruiz at the house at 1428 South Sedgwick. Instead, Benton had sent the informant to that address for the purpose of

attempting to observe documents which could then be used to support the obtaining of a documents warrant.

None of this is revealed in the affidavit. Nor is it revealed that Ruiz, suspecting the informant, refused to let the informant into the house. Instead, the informant was barred from entering the house and was obliged to stand in the doorway. It is from this position that the informant saw or purported to see the telephone bill inside the house.

The testimony of Detective Benton established not only that Ruiz was suspicious of the informant, but that Benton *knew* he was suspicious of the informant, and knew that Ruiz would not be willing to discuss anything relating to drugs with the informant.[2] Accordingly, the informant was sent to the house solely to observe whatever documents might be lying about.

Benton's belief that Ruiz was suspicious and would not consent to speak about his . drug dealing with the informant was correct. Ruiz refused to talk about such matters with the informant. The discussion between Ruiz and the informant concerning Ruiz's storage shed, mentioned in the affidavit, related not to marijuana but solely to some antique chairs. Detective Benton knew that the conversation related not to drugs but to furniture, yet somehow he failed to mention this fact in the affidavit.

The court finds it impossible to conclude that paragraph 15 is anything other than an artfully constructed series of half-truths. In determining whether to suppress evidence obtained pursuant to this warrant, the court must determine whether, absent the misleading inferences contained in paragraph 15, "there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks,* 438 U.S. at 172, 98 S.Ct. at 2684.

Once the misleading character of paragraph 15 is corrected, the affidavit is clearly insufficient to justify the search of the residence. The only facts in the affidavit which are in any way connected with the house are that there was a telephone bill within the house as well as some other "documents". This is a state of affairs which the court can say with a fair degree of certainty is also true of almost every other residence in the United States.

There is no evidence that the "documents" identified in the affidavit contained information relating to drug dealing. There is no evidence that Ruiz used the telephone in connection with his alleged drug dealing, or that the telephone bill represented evidence of any criminal activity. Telephones are frequently used for wholly legitimate purposes and just as frequently produce bills for payment.

Nor, as indicated earlier, is the fact that different names were listed in the property tax and utility records for the house sufficient probable cause to justify a warrant. There was no evidence in the affidavit, and none was produced at the hearing, that either of these names was fictitious. To the contrary, the hearing revealed that the name listed in the property tax records was a prior resident of the house.

The court finds that the warrant for the search of the house at 1428 South Sedgwick was not issued upon probable cause. In addition, the court finds that the warrant for the search of the storage unit at 3440 West Douglas was not issued upon probable cause, since the affidavit supporting this search is composed of the same facts alleged in the first affidavit, combined with information gained as a result of the search of the residence.

Finally, the court finds that these searches cannot be justified, as suggested by the government, on the basis of the good faith exception to the exclusionary rule identified in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). First, the court finds that the affidavit, stripped of its misleading character, is simply " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " *Leon,* 468 U.S. at 923, 104 S.Ct. at 3421 (quoting *Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265–66, 45 L.Ed.2d 416 (1975) (Powell, J. concurring in

---

**2.** In Detective Benton's words, Ruiz was "hinked up" about the informant.

part)). Further, in determining whether to apply the good faith exception, the court cannot look solely to the officer executing the warrant, but must also look to "the officers who originally obtained it or who provided information material to the probable cause determination." *Leon,* 468 U.S. at 924 n. 24, 104 S.Ct. at 3420, n. 24. In the present case that good faith cannot be said to be present.

IT IS ACCORDINGLY ORDERED this 28th day of May, 1993, that the defendant's motion to suppress is hereby granted.