46 F.3d 1148
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Randall WYNN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Abel OLIVERAS-PEREZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Adrian PLASENCIA-GARCIA, Defendant-Appellant.
 Nos. 93-30421, 93-30422 and 94-30063.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted: Jan. 11, 1995.
Decided: Jan. 30, 1995.
 
 1
 Before: PREGERSON and TROTT, Circuit Judges, and FITZGERALD,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Randall Wynn, Abel Oliveras-Perez, and Adrian Plasencia-Garcia appeal their jury convictions and sentences under the Sentencing Guidelines for conspiracy to distribute controlled substances (21 U.S.C. Secs. 841(a)(1) and (b)(1), 846), aiding and abetting (18 U.S.C. Sec. 2), and possession with intent to distribute methamphetamine within 1000 feet of a public school (21 U.S.C. Secs. 841(a)(1) and 860). We have jurisdiction over these timely appeals under 28 U.S.C. Sec. 1291. We affirm their convictions and their sentences.
 
 I. BACKGROUND
 
 4
 This case involves three defendants[1] convicted of conspiring to distribute controlled substances, and related drug transactions. The superseding indictment charged the appellants as follows:
 
 
 5
 Count 1--All defendants; conspiracy to possess with intent to deliver heroin, methamphetamine, cocaine and marijuana. 21 U.S.C. Secs. 841(a)(1) and 846.
 
 
 6
 Count 2--Plasencia-Garcia; possession with the intent to distribute methamphetamine. 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2.
 
 
 7
 Count 4--Oliveras-Perez; possession with intent to distribute methamphetamine within 1000 feet of a public school. 21 U.S.C. Secs. 841(a)(1) and 860(a).
 
 
 8
 The defendants were convicted on all counts after a twelve-day jury trial.
 
 
 9
 The facts in this case are well-known to the parties and will not be repeated here. The facts as described in the light most favorable to the government are contained at pages 2-22 (paragraphs 1-60) of the government's brief.
 
 II. ANALYSIS
 
 10
 We address each of the issues raised on appeal in turn below.
 
 A. SUPPRESSION
 
 11
 Oliveras-Perez asserts that the district court erred when it denied his pre-trial motion to suppress. In the suppression motion, Oliveras-Perez challenged the search of 79 Lincoln Street, as well as his warrantless arrest. The court ruled that the search warrant for 79 Lincoln Street was based on probable cause and that the good faith exception applied. The trial court also held that the police had probable cause for Oliveras-Perez's warrantless arrest.
 
 1. The Search of 79 Lincoln Street
 
 12
 "We review a court's issuance of a search warrant for clear error and will uphold the warrant so long as the court had a 'substantial basis' for concluding that the totality of the circumstances established probable cause." United States v. Williams, 989 F.2d 1061, 1066 (9th Cir. 1993). In United States v. Castillo, 866 F.2d 1071, 1076 (9th Cir. 1988), we stated further that we must review the magistrate's determination of probable cause "independently of the conclusion reached by the district court." Whether the good faith exception to the exclusionary rule applies in a given case is subject to de novo review. United States v. Hove, 848 F.2d 137, 139 (9th Cir. 1988).
 
 
 13
 On December 31, 1992, Klamath County police officers executed a search warrant at 79 Lincoln Street in Klamath Falls, Oregon. The warrant was signed by a Klamath County circuit court judge. Police found a bag of marijuana, a hydraulic drug press, cutting agents, scales, lists of phone numbers, documents appearing to be drug transaction records, and receipts showing the recent transfer of funds to Mexico. (Red br. at 4, p 5.)
 
 
 14
 At the hearing on his motion to suppress, Oliveras-Perez testified that he had lived at 79 Lincoln Street for three months up to and including the date of the execution of the search warrant. The government conceded that he had standing to challenge the warrant.
 
 
 15
 To establish probable cause, the facts alleged in an affidavit in support of a search warrant "must be sufficient to justify a conclusion that the property which is the object of the search is probably on the premises to be searched at the time the warrant is issued." United States v. Baldwin, 987 F.2d 1432, 1435 (9th Cir.) (quoting United States v. Garza, 980 F.2d 546, 550 (9th Cir. 1992)), cert. denied, 113 S. Ct. 2948 (1993). In this case, the affidavit in support of the 79 Lincoln Street warrant supplied the state court judge with sufficient information to support a conclusion that Oliveras-Perez was involved in selling drugs, and that he lived at 79 Lincoln Street.[2] We have previously found that it is reasonable to assume that evidence of drug dealing may be found in the home of a suspected drug dealer. Baldwin, 987 F.2d at 1435. Here we conclude that under the totality of the circumstances, the state court judge did not clearly err by finding that probable cause existed to issue the search warrant.
 
 
 16
 The district court also found an alternative basis for denying Oliveras-Perez's motion to suppress based on the search warrant, stating "there's no question that the officer was operating on his good faith belief it [the warrant] was proper [under] Leon." (Cisneros-Silva ER at 137.) In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court held that evidence may be used in the government's case-in-chief when it is obtained by a police officer acting on authority of a warrant later found to be unsupported by probable cause, provided the officer had an objective good faith belief that the warrant was valid. We agree with the district court that were there any doubt about the sufficiency of the warrant, there can be no doubt that it was at least facially valid and that reliance upon it was objectively reasonable. See id. at 922-24.
 
 2. The Warrantless Arrest
 
 17
 Oliveras-Perez moved the district court to suppress evidence seized from his person as a result of his warrantless arrest. The district court denied the motion, finding that the arresting officer had sufficient facts to suspect that Oliveras-Perez was involved in illegal activity at the time of his arrest. (Oliveras-Perez ER at 47-49.)
 
 
 18
 Probable cause to arrest is a mixed question of law and fact. We review the district court's findings of fact for clear error, and we review its legal conclusions de novo. United States v. Alvarez, 810 F.2d 879, 881 (9th Cir. 1987). Under United States v. Watson, 423 U.S. 411 (1976), police officers are authorized to make warrantless arrests in public places only where there is probable cause. The test for probable cause has been summarized as whether the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution [to believe] in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).
 
 
 19
 At the time police arrested Oliveras-Perez, they knew from their informant, Kathy Daly, that he regularly sold methamphetamine to her. The police also personally observed Oliveras-Perez in the car with "Kiki" (Cisneros-Silva), the other person Daly stated she regularly purchased drugs from. The officers heard Daly order drugs from Kiki, and heard Kiki speak to a man named Abel. The police then saw Kiki go into Daly's residence to sell Daly the drugs, while Abel remained in the car and "acted as a lookout" by looking up and down the street. (Oliveras-Perez ER at 30.) Although Officer Dailey's observation of Oliveras-Perez looking up and down the street, taken by itself, may not have supported a finding beyond a reasonable doubt that he was engaged in counter-surveillance activity, see United States v. Penagos, 823 F.2d 346, 348-350 (9th Cir. 1987), we agree with the district court that this observation, coupled with the information supplied by Kathy Daly, provided a sufficient basis for probable cause to arrest Oliveras-Perez.
 
 
 20
 We agree with the district court that the police had probable cause to arrest Oliveras-Perez. Therefore the court was correct in refusing to suppress the methamphetamine found hidden in his crotch.
 
 B. MISJOINDER AND SEVERANCE
 
 21
 Wynn[3] argues that the district court erred when it denied the motions to sever filed by Plasencia-Garcia and two other co-defendants whose appeals have been severed. Wynn and Oliveras-Perez joined in the renewed severance motion and the close of trial. (Wynn ER at 14.)
 
 1. Misjoinder
 
 22
 Wynn argues that Count Eight of the indictment, which charged Sanchez-Cervantes with illegally reentering the United States after being deported for prior drug crimes, was misjoined with the other counts of the indictment. Under Fed. R. Crim. P. 8, "joinder of charges against multiple defendants is permissible only if the defendants 'are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."' United States v. Sanchez-Lopez, 879 F.2d 541, 550 (9th Cir. 1989) (quoting Fed. R. Crim. P. 8).
 
 
 23
 The government asserts that this misjoinder argument is waived on appeal because the defendants' motions to sever below were based on Fed. R. Crim. P. 14, and not on Rule 8. Our review of the motions to sever confirms this. (See Plasencia-Garcia Motion to Sever, in Wynn ER at 5; Cisneros-Silva Motion to Sever, in Brahms-Garcia ER at 8.[4] )
 
 
 24
 In United States v. Smith, 795 F.2d 841, 850 (9th Cir. 1986), cert. denied, 481 U.S. 1032 (1987), we ruled that a motion for severance based on Rule 14 does not preserve a Rule 8 misjoinder objection for appeal. In Smith, we reviewed the record and found that the appellant had made no argument below based on Rule 8, and we therefore concluded that Smith's appeal based on Rule 8 was waived. Id. In this case, our review of the motions filed[5] reveals that defendants' arguments were based solely on Rule 14. Therefore, we conclude that the Rule 8 issue was not raised below and is thus waived.
 
 2. Severance
 
 25
 Wynn also claims that the district court erred in failing to grant him Rule 14 severance. Rule 14 provides that a defendant may move to sever co-defendants for trial where joinder of defendants is prejudicial to him.
 
 
 26
 "The district court has wide discretion in ruling on a severance motion." United States v. Vaccaro, 816 F.2d 443, 449 (9th Cir.), cert. denied, 484 U.S. 928 (1987). To satisfy this heavy burden, "an appellant must show that the joint trial was so prejudicial as to require the exercise of the trial court's discretion in only one way: by ordering a separate trial." United States v. Mariscal, 939 F.2d 884 (9th Cir. 1991) (citation omitted).
 
 
 27
 Wynn argues that because much of the evidence presented in this case did not relate to his particular conduct, he was prejudiced by having his case joined with his six co-defendants' cases. In deciding a Rule 14 motion, the trial court looks to whether "the jury will be able to segregate the evidence applicable to each defendant." Vaccaro, 816 F.2d at 448. Here the court instructed the jury to separately weigh the evidence against each co-defendant. (Wynn ER at 32.) Moreover, the fact that more evidence was introduced against his co-defendants than against Wynn is insufficient to show that joinder was improper. United States v. Taren-Palma, 997 F.2d 525, 533 (9th Cir. 1993), cert. denied, 114 S. Ct. 1468 (1994).
 
 
 28
 Wynn has failed to meet his heavy burden on the issue of why joinder with his co-defendants prejudiced him. The district court did not abuse its discretion in denying the Rule 14 motion to sever.
 
 
 29
 C. MOTION TO DISMISS BASED ON GOVERNMENT'S DEPORTATION OF A WITNESS
 
 
 30
 Plasencia-Garcia[6] argues that the trial court erred in denying his motion to dismiss based on the government's deportation of witness Arnulfo Segura-Gonzalez.
 
 
 31
 To obtain relief from deportation of a potentially favorable witness, a defendant must show that the government acted in bad faith in deporting the witness, and that the defendant was prejudiced by this action. United States v. Valenzuela-Bernal, 458 U.S. 858, 866-67 (1982); United States v. Dring, 930 F.2d 687, 693 (9th Cir. 1987), cert. denied, 113 S. Ct. 110 (1992). The district court denied Plasencia-Garcia's motion, finding that the defendant failed make a showing that the government had acted in bad faith in deporting Segura-Gonzalez. (Plasencia-Garcia ER at 28)
 
 
 32
 The district court's conclusion that the government did not act in bad faith in deporting Segura-Gonzalez is a finding of fact reviewed for clear error. United States v. Velarde-Gavarrete, 975 F.2d 672, 676 (9th Cir. 1992), cert. denied, 113 S. Ct. 3010 (1993).
 
 
 33
 In Plasencia-Garcia's motion to dismiss, the only facts listed which might lead to a finding of prosecutorial bad faith is his allegation that government agents interviewed Segura-Gonzalez during the investigation of this case, but then deported him without notice to Plasencia-Garcia. (Plasencia-Garcia ER at 9.) At the hearing on his motion to dismiss, which occurred after all the trial testimony had been received, the court told Plasencia-Garcia's counsel that it had "no evidence" of bad faith. (Id. at 24-25.) Plasencia-Garcia's counsel's only additional allegation at that point was that she had made several inquiries of the government as to the witness's whereabouts, but did not discover that Segura-Gonzalez had been deported until "a day or two" before trial. (Id. at 26-27.) The court subsequently denied the motion. (Id. at 28.)
 
 
 34
 Based on our review of the evidence presented to the court on this issue, we conclude that the trial court did not clearly err in finding that the government did not deport Segura-Gonzalez in bad faith. The district court therefore properly denied Plasencia-Garcia's motion to dismiss.
 
 D. SUFFICIENCY OF THE EVIDENCE
 
 35
 Appellants make two separate arguments as to the sufficiency of the evidence.
 
 1. Single versus Multiple Conspiracy
 
 36
 Wynn, Oliveras-Perez, and Plasencia-Garcia argue that their convictions on Count One, the conspiracy count, rest on insufficient evidence because the government failed to prove one overall conspiracy, rather than multiple conspiracies. See United States v. Bibbero, 749 F.2d 581, 586 (9th Cir. 1984), cert. denied, 471 U.S. 1103 (1985) ("[t]he question of whether a single conspiracy has been proved, rather than multiple conspiracies ... is essentially a question of the sufficiency of the evidence").
 
 
 37
 We will uphold a conviction "if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of each essential element of the crime charged." United States v. Penagos, 823 F.2d 346, 347 (9th Cir. 1986).
 
 
 38
 To prove a conspiracy under 21 U.S.C. Sec. 846, the government must show (1) an agreement to accomplish an illegal objective, and (2) the requisite intent necessary to commit the underlying offense. United States v. Shabani, 115 S. Ct. 382 (1994). "To establish the existence of a single conspiracy, rather than multiple conspiracies, the government must prove that an overall agreement existed among the conspirators." Bibbero, 749 F.2d at 587. "A mere change in participants and a lapse of time, without more, are insufficient to support a finding of multiple conspiracies." United States v. Taren-Palma, 997 F.2d at 530. Further, a single conspiracy may involve several subagreements or subgroups of conspirators. Bibbero, 749 F.2d at 587.
 
 
 39
 The government's theory as to the link between the defendants is represented in the chart contained in Wynn's presentence report (PSR). (See chart inserted in Wynn PSR between p. 5 and p.6.) The chart depicts Plasencia-Garcia at the head of the network with two main offshoots. Appellants' main argument as to the existence of multiple conspiracies is that after 1990, the drug dealing of Plasencia-Garcia--through his runners Castillo-Arvizu and Brahms-Garcia--had nothing to do with the drug dealing activities of Sanchez-Cervantes (who, in turn, used his own drug runners, Oliveras-Perez and Cisneros-Silva). Appellants admit that Plasencia-Garcia and Sanchez-Cervantes conspired to sell cocaine in 1990. Sanchez-Cervantes was then in prison for all of 1991, causing a gap in his participation in the conspiracy. But there was evidence presented to the jury that Plasencia-Garcia and Sanchez-Cervantes again conspired to sell drugs in 1992. (Red br. at 4-5, 14, paragraphs 6, 37.) The facts, spelled out at length in the government's brief, provide ample proof that a single conspiracy existed.
 
 
 40
 Once a conspiracy is shown to exist, evidence of a defendant's "slight connection" to it is sufficient to convict him of knowing participation in the conspiracy. The evidence, discussed above, which tied Sanchez-Cervantes to the main conspiracy in turn clearly linked Oliveras-Perez to the main conspiracy. There was also sufficient evidence presented to the jury from which it could find beyond a reasonable doubt that Wynn knew of the conspiracy. (Red br. at 16-19, paragraphs 43, 45-49.) As to Plasencia-Garcia, in his own brief he acknowledges the depth of his involvement with the two subgroups. (See Plasencia-Garcia Blue br. at 12.) The evidence presented of Plasencia-Garcia's involvement was more than sufficient to support his conviction of conspiracy under 18 U.S.C. Sec. 846.
 
 
 41
 2. Possession with Intent to Distribute Methamphetamine
 
 
 42
 Oliveras-Perez argues that the evidence was insufficient to support his conviction on Count Four of the indictment, which charged him with possessing methamphetamine with the intent to distribute within 1000 feet of a school, in violation of 21 U.S.C. Secs. 841(a)(1) and 860(a).
 
 
 43
 This conviction arose out of a controlled buy of cocaine described in the government's brief at page 3, paragraphs 2-4. The facts in the light most favorable to the government describe the controlled buy as follows.
 
 
 44
 Oliveras-Perez drove to Kathy Daly's house with Cisneros-Silva in a car registered to Sanchez-Cervantes. Cisneros-Silva went into Daly's house and sold an ounce of methamphetamine to Daly while Oliveras-Perez remained in the car and "served as a lookout." (Red br. at 3, p 3.) Cisneros-Silva and Oliveras-Perez were then arrested, and police found two baggies containing 25.9 grams of methamphetamine hidden in Oliveras-Perez's crotch. (Id. at p 4.) The methamphetamine found on Oliveras-Perez had the exact purity level and contained the same cutting agent as the methamphetamine delivered to Daly. (Id.)
 
 
 45
 To prove possession with intent to distribute methamphetamine, the government must prove beyond a reasonable doubt that the defendant (1) knowingly (2) possessed methamphetamine (3) with the intent to distribute it. United States v. Afora, 876 F.2d 76, 77 (9th Cir. 1989). Oliveras-Perez argues that because the evidence showed that he stayed in the car and merely looked up and down the street while Cisneros-Silva went into Daly's house to sell her the drugs, the government failed to prove more than his "mere proximity" to the drug sale. See United States v. Sanchez-Mata, 925 F.2d 1166, 1168 (9th Cir. 1991) (proving a defendant's "mere proximity" to a drug is insufficient to sustain a conviction of possession with intent to distribute).
 
 
 46
 But Oliveras-Perez's conviction on Count Four was based upon more than his presence in the car during the drug sale, or his behavior, which was suggestive of counter-surveillance. Methamphetamine was found hidden on his person, and the evidence strongly suggested that it came from the same source as the drugs sold to Daly while he waited in the car. Moreover, Oliveras-Perez lied to the police about his identity when he was arrested, unlike the defendant in Sanchez-Mata.[7]
 
 
 47
 The evidence clearly supported a finding that Oliveras-Perez possessed methamphetamine with the intent to distribute it.
 
 E. EVIDENCE OF PRIOR BAD ACTS
 
 48
 Plasencia-Garcia argues that the trial court erred in allowing informant Ernest Polsfuss to testify about Plasencia-Garcia's prior bad acts.
 
 
 49
 "Evidence of prior crimes and bad acts can be admitted under Fed. R. Evid. 404(b) if it is to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake and not to show bad character." United States v. Houser, 929 F.2d 1369, 1373 (9th Cir. 1990).
 
 
 50
 "We review for abuse of discretion the district court's decision to admit evidence of prior bad conduct under Fed. R. Evid. 404(b)." United States v. Arambula-Ruiz, 987 F.2d 599, 602 (9th Cir. 1993). Whether or not evidence falls within the scope of Rule 404(b) is a question of law reviewed de novo. United States v. Williams, 989 F.2d at 1070. A district court's decision balancing probative value against prejudicial effect under Fed. R. Evid. 403 is reviewed for abuse of discretion. Houser, 929 F.2d at 1373.
 
 
 51
 The evidence at issue here is testimony by Polsfuss that he met Plasencia-Garcia in jail in 1992 (during the time of the charged conspiracy), and that he wanted to develop a drug dealing connection with Plasencia-Garcia. The government brought this expected testimony to the attention of the trial court prior to Polsfuss's testimony. The government argued that this was not prior bad act evidence, but instead was evidence of the drug dealing relationship between Polsfuss[8] and Plasencia-Garcia. The court told the government not to raise the matter unless the defense "opened the door" during cross-examination.
 
 
 52
 On cross-examination, defense counsel accused Polsfuss of pushing Plasencia-Garcia into dealing drugs. Defense counsel also cross-examined Polsfuss on the timing of his contact with the DEA. The apparent purpose behind the latter line of questioning was to suggest that Polsfuss did not know Plasencia-Garcia when he first went to the DEA.
 
 
 53
 On re-direct examination, the court ruled that defense counsel had invited evidence of the jailhouse meeting. The court then allowed the government to question Polsfuss about how the two men met in jail, and talked about selling drugs and about the drug dealers they knew. (Plasencia-Garcia ER at 15m.) Polsfuss also testified that he felt Plasencia-Garcia had "well-established drug markets." (Plasencia-Garcia ER at 15r.)
 
 
 54
 The government argues that this evidence was not Rule 404(b) bad act evidence. We agree. This evidence was directly relevant to show the drug dealing relationship between conspirators Polsfuss and Plasencia-Garcia. As in Williams, 989 F.2d at 1070,[9] this evidence is "inextricably intertwined" with the conspiracy charged, and thus does not fall within the scope of Rule 404(b). The jailhouse meeting between Polsfuss and Plasencia-Garcia furthered the conspiracy, and this testimony describing it "provided necessary context" as to its development. Id. at 1070. Further, even if some portion of the evidence could be categorized as prior bad acts evidence, its admission was harmless, given the large amount of evidence entered against Plasencia-Garcia, which included video and audio tape of Plasencia-Garcia discussing drug deals and accepting payment for drugs.
 
 
 55
 F. IMPROPER COMMENTS OF COURT AND PROSECUTOR DURING OPENING STATEMENT AND CLOSING ARGUMENT
 
 
 56
 Wynn and Plasencia-Garcia[10] argue that the court erred in when it allowed in certain comments made by the prosecutor, and when it made prejudicial remarks to a defense attorney during the closing argument.
 
 
 57
 The appellants bring several remarks to our attention. First, during his opening statement, the prosecutor stated that informant Ernest Polsfuss "will walk you through many of [the drug] transactions .... Not all of them, because we would be here for weeks." (Plasencia-Garcia ER at 19.) Plasencia-Garcia assigns error to this statement because he says that it improperly referred to evidence that the government had no intention of producing at trial.
 
 
 58
 Next, during closing argument, one of the defense attorneys referred to government witness James Colburg as "scum of the earth." In rebuttal, the prosecutor made the following argument:
 
 
 59
 And James Colburg is another nasty man with a terrible criminal history. But let me ask you this. If these [government witnesses] are so bad--as [defense counsel] puts it, "scum of the earth," why are all these defendants hanging out with them? And more importantly, doing business with them on a regular basis? If they're scum of the earth, and they're getting drugs from them, what does that make them?
 
 
 60
 (Plasencia-Garcia ER at 31)
 
 
 61
 Finally, the prosecutor made a comment during his closing argument about the seating arrangement of the seven defendants. According to the government's brief, the trial court allowed the defendants to choose their seating arrangement. (Red br. at 46) The defendants chose to seat themselves in a group of four and another group of three (with the groups separated by seven feet), thus bolstering their multiple conspiracy defense. During its rebuttal argument, the government commented on the defense attorneys' "valiant effort" to suggest multiple conspiracies, and directed the jury's attention to the seating arrangement. A defense lawyer then objected, stating "we have no choice in where we're sitting." (Plasencia-Garcia ER at 36.) The court stated in response, "That misstates what happened." (Id.) The court made this comment in the presence of the jury.
 
 
 62
 Plasencia-Garcia, citing United States v. Schuler, 813 F.2d 978, 980 (9th Cir. 1987), argues that because the comments of the prosecutor implicated his Fifth and Sixth Amendment rights, we must review this claim of error de novo. The government states that under United States v. Foppe, 993 F.2d 1444, 1450 (9th Cir.), cert. denied, 114 S. Ct. 615 (1993), we instead should review the claim of improper argument under the plain error standard.
 
 
 63
 Plasencia-Garcia does not allege a specific constitutional violation here. Therefore, we review his claim under the plain error standard.[11]
 
 
 64
 Under the plain error standard, "the critical inquiry is whether, in the circumstances of the trial as a whole, the remarks were so prejudicial that they likely influenced the jury adversely to the defendant and deprived the defendant of a fair trial." Foppe, 993 F.2d at 1450. None of the comments complained of here reach that level of prejudice. For example, the comment about the defendants impliedly being "scum of the earth" was not improper, given that this phrase was first uttered by the defense. See United States v. Falsia, 724 F.2d 1339, 1342 (9th Cir. 1983) ("[w]here the defendant 'opens the door' to an argument, it is fair advocacy for the prosecution to enter.").
 
 
 65
 As to the comment by the trial court about the seating arrangement, it was clearly proper given that defense counsel misstated that the defendants had no choice as to where to sit. Therefore Wynn's argument on that basis must also fail.
 
 G. JURY INSTRUCTION ON CONSPIRACY
 
 66
 Plasencia-Garcia and Oliveras-Perez argue that the jury was not properly instructed on its theory of defense; i.e., that there was no single conspiracy, but, at most, multiple conspiracies.
 
 
 67
 After instructing the jury on the elements of conspiracy, the court gave the following instruction:
 
 
 68
 If you find that the conspiracy charged did not exist, then you must return a not guilty verdict on Count 1, even though you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the charged conspiracy, then you must find the defendant not guilty, even though that defendant may have been a member of some other conspiracy.
 
 
 69
 (Wynn ER at 46.) This instruction is Sec. 8.05B from the Manual of Model Criminal Jury Instructions for the 9th Circuit (1992 ed.).
 
 
 70
 The defendants submitted at least two lengthy alternative instructions on its theory of multiple conspiracies. (See Oliveras-Perez Blue br. at 24; Plasencia-Garcia Blue br. at 21.)
 
 
 71
 "We review de novo whether the court's instructions adequately presented the defendant's theory. If the instructions fairly and adequately cover the elements of an offense, we review their precise formulation for an abuse of discretion." United States v. Woodley, 9 F.3d 774, 780 (9th Cir. 1993) (citations omitted).
 
 
 72
 Here, we conclude that the model jury instruction issued by the court correctly set forth the law and adequately covered the defendants' multiple conspiracy defense.
 
 
 73
 H. JURY INSTRUCTION ON UNANIMITY AS TO THE OBJECT OF THE CONSPIRACY
 
 
 74
 Plasencia-Garcia and Oliveras-Perez argue that the court should have given a special unanimity instruction as to the particular drug found as the object of the conspiracy. The court first instructed the jury that in considering the conspiracy charge, they must find that "there was an agreement between two or more persons to commit at least one crime charged in Count 1 of the indictment." (Wynn ER at 42.)
 
 
 75
 The district court then instructed the jury as follows:
 
 
 76
 The government need not prove that the object of the conspiracy was to possess with intent to distribute each of the four substances: heroin, methamphetamine, cocaine and marijuana. It is sufficient if the government established beyond ... a reasonable doubt that an object of the conspiracy was to possess any one of the four prohibited drugs.
 
 
 77
 (Wynn ER at 42-43.) Oliveras-Perez's attorney apparently objected to this instruction, (Oliveras-Perez Blue br. at 25), but Oliveras-Perez does not provide us with that portion of the transcript, nor does he attempt to describe to us the content of that objection. The government argues that while defense counsel made a general objection on the court's instruction as to the object of the conspiracy, none of the defendants requested an alternative instruction, so we should review this question under the plain error standard. See United States v. Bryan, 868 F.2d 1032, 1038 (9th Cir.) (plain error review where the defendant neither specified the basis for his objection to a unanimity instruction, nor requested an alternative instruction), cert. denied, 493 U.S. 858 (1989). We agree with the government, and review this claim for plain error.
 
 
 78
 Oliveras-Perez and Plasencia-Garcia argue that the jury should have been instructed that they had to agree unanimously as to which particular drug was the object of the conspiracy. They assert that although Count One of the indictment charged the defendants with conspiring to possess with intent to distribute the four drugs in the conjunctive, the court instructed the jury in the disjunctive, when it told the jury that a guilty verdict could be based on a finding that any one of the four drugs was the object of the conspiracy. Appellants argue that to remedy this the court should have given curative instructions to ensure that the jurors unanimously agreed as to the object of the conspiracy.
 
 
 79
 When a jury is presented with multiple schemes in a routine case, "it may be possible to protect the defendant's right to a unanimous jury verdict by ... a general instruction." United States v. Echeverry, 719 F.2d 974 (9th Cir. 1983). If it appears, however, that there is a genuine possibility of jury confusion as to the object of the conspiracy, whether due to a discrepancy between the evidence presented and the indictment, or because of the complexity of the evidence, then a general instruction will not suffice. United States v. Castro, 887 F.2d 988, 993 (9th Cir. 1989); Echeverry, 719 F.2d at 975.
 
 
 80
 Here we do not think the possibility of jury confusion was strong enough to warrant a curative instruction. Although the conspiracy charged in this case ranged over a few years, and involved seven co-defendants, it was not complex in its structure. Further, as we ruled in Section D, supra, there was clear evidence presented to the jury as to a single conspiracy. In addition, as was the case in Castro, where we found no error where the court failed to give a unanimity instruction, the jury here "did not request any additional instructions on the objects of the conspiracy." Castro, 993 F.2d at 993. We therefore conclude that the trial court did not plainly err when it failed to give a special instruction on juror unanimity as to the object of the conspiracy.
 
 
 81
 I. JURY INSTRUCTION ON PLASENCIA-GARCIA'S FAILURE TO TESTIFY
 
 
 82
 Plasencia-Garcia did not testify. He requested the following instruction:
 
 
 83
 The law permits an accused in a criminal case to choose to testify or proceed through his attorney. No inference of any kind may be drawn from the defendant's choice not to testify. As previously stated, the burden is entirely on the prosecution to present evidence to rebut the presumption of innocence.
 
 
 84
 (Plasencia-Garcia ER at 64.) The trial court did not give that instruction, but it did instruct the jury that "[a] defendant is presumed to be innocent and does not have to testify or present any evidence to prove innocence." (Id. at 44) (emphasis added).
 
 
 85
 Although Plasencia-Garcia submitted an alternative instruction in this case, he did not object to the instruction as given. Accordingly, we review this instruction for plain error. See United States v. Kessi, 868 F.2d 1097, 1102 (9th Cir. 1989) (offering an alternative instruction is not enough to preserve a claim under Fed. R. Crim. P. 30).
 
 
 86
 In Carter v. Kentucky, 450 U.S. 288 (1981), the Supreme Court held that, when requested by defense, a trial court must instruct the jury that they may not consider the defendant's failure to testify during their deliberations and may draw no inference from that election. The Court ruled that failure to so instruct constitutes a Fifth Amendment violation, and that a trial court's general instruction on presumption of innocence is insufficient in this context. Id. at 304. Courts have subsequently referred to this as the "no inference" instruction.
 
 
 87
 Although the Court in Carter ruled that a general instruction on the presumption of innocence was not sufficient to protect the defendant's Fifth Amendment right, Carter did not address whether an instruction would be adequate if it contained the language in this case. Here, the instruction contained additional language from the instruction in Carter: the instruction here told the jury the defendant "does not have to testify."
 
 
 88
 In United States v. Patterson, 648 F.2d 625 (9th Cir. 1981), the trial court instructed the jurors while impanelling them that "you do not have to take the witness stand and testify against yourself." 648 F.2d at 631 n.16. The defendant in Patterson had requested that the court give an explicit "no inference" instruction at the close of trial, but the court refused to do so. 648 F.2d at 630 n.12. Although we stated in Patterson that the defendant's proposed instruction was preferable, we did not decide whether, if the court's impanelling instruction had been given at the close of trial, it would have been adequate under Carter.[12] See 648 F.2d at 631 n.16 ("We need not consider ... whether the language used would require reversal had it been used at the appropriate time.").
 
 
 89
 The instruction in the present case did more than the instruction in Carter v. Kentucky. It informed the jury that the defendant was not obligated to testify. While we recognize that the instruction did not contain the specific words "no inference," we also note that Plasencia-Garcia did not object to the instruction as given. The trial court did not plainly err in giving this instruction to the jury.
 
 J. SENTENCING AS A MINOR PARTICIPANT
 
 90
 Oliveras-Perez and Wynn argue that they were "minor participants" under U.S.S.G. Sec. 3B1.2, and that the court should have reduced each of their offense levels by two points as a result.
 
 
 91
 Section 3B1.2 of the Sentencing Guidelines reads:
 
 Sec. 3B1.2. Mitigating Role
 
 92
 Based on the defendant's role in the offense, decrease the offense level as follows:
 
 
 93
 (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
 
 
 94
 (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
 
 
 95
 In cases falling between (a) and (b), decrease by 3 levels. U.S.S.G. Sec. 3B1.2. Application Note 3 to this provision explains that "[f]or purposes of Sec. 3B1.2(b), a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. Sec. 3B1.2, cmt. n.3.
 
 
 96
 We review the trial court's determination that a defendant is not a minor participant for clear error. United States v. Peters, 962 F.2d 1410, 1414 (9th Cir. 1992).
 
 1. Oliveras-Perez
 
 97
 Oliveras-Perez argues that he was nothing more than a courier in this drug network, and thus he should have received the minor participant adjustment.
 
 
 98
 There was much evidence on the record from which the court could conclude that Oliveras-Perez was not a minor participant. Evidence of large-scale drug dealing, including a hydraulic press, was seized from his house. Oliveras-Perez was arrested with 30 grams of methamphetamine on his person, just after he acted as a lookout during a drug buy where Cisneros-Silva sold $1,000 of methamphetamine. In addition, informants Daly and Colburg testified that Oliveras-Perez and Cisneros-Silva sold them each a half-gram of methamphetamine every other day for three months.
 
 
 99
 Oliveras-Perez is clearly more culpable than the defendants in the cases he cites in support of his argument. See United States v. Madera-Gallegos, 945 F.2d 264, 269 (9th Cir. 1991) (wife and partner of heroin dealer was a minor, but not minimal, participant where she retrieved a drug sample, and gave it to her husband, who gave it to the undercover agent); United States v. Christman, 894 F.2d 339, 341 (defendant who negotiated the amount and price for a drug transaction but did not profit from it was a minor, but not minimal, participant).
 
 
 100
 The district court's findings are supported by the record and are not clearly erroneous. The court did not clearly err in determining that Oliveras-Perez was not a minor participant.
 
 2. Wynn
 
 101
 Wynn argues that because he did not join the conspiracy until December 1992 and did not sell the drugs, the court should have sentenced him as a minor participant.
 
 
 102
 The evidence at trial showed that Wynn joined the conspiracy as a "cutter." Wynn had special expertise in enhancing poor-quality methamphetamine by a process known as "soft rocking." (Red br. at 17-18, paragraphs 46-49.) Witness Ernest Polsfuss also testified that Wynn sold some of the cocaine that Polsfuss received from Plasencia-Garcia. (Red br. at 17, p 45.) Further, police seized several thousand dollars worth of methamphetamine from a motel room occupied by Wynn and his girlfriend. (Red br. at 10, p 21.)
 
 
 103
 This evidence supports the district court's finding that Wynn was more than a minor participant in the conspiracy. Therefore, we conclude that the court did not clearly err when it refused to make the minor participant adjustment to Wynn's offense level.
 
 K. ACCEPTANCE OF RESPONSIBILITY
 
 104
 Wynn argues that the district court erred when it failed to decrease his offense level by two levels based on acceptance of responsibility, under U.S.S.G. Sec. 3E1.1(a). Wynn makes a constitutional argument here, contending that the acceptance of responsibility provision unfairly penalizes him for asserting his right to a trial.[13] In United States v. Gonzalez, 897 F.2d 1018, 1021 (9th Cir. 1990), we rejected that argument, and held instead that the purpose of that provision is not to punish defendants for exercising their rights, but instead its purpose is to encourage defendants to accept responsibility for their actions at early stages of prosecution. See also United States v. Davis, 960 F.2d 820, 828-29 (9th Cir.), cert. denied, 113 S. Ct. 210 (1992). We therefore reject Wynn's argument, as we have ruled squarely against this argument in Gonzalez.
 
 L. DRUG QUANTITY CALCULATIONS
 
 105
 Oliveras-Perez and Wynn contend that the trial court miscalculated the drug quantities attributable to them in fixing their sentences. The government argues in response that the trial court took "an extremely conservative approach" in establishing the drug quantities attributable to the defendants. (Red br. at 51.)
 
 
 106
 The district court's findings of fact are reviewed for clear error. Though we review the court's application of the Guidelines de novo, due deference is given to the sentencing court's application of the Guidelines to the facts. United States v. Motz, 936 F.2d 1021, 1024 (9th Cir. 1991).
 
 1. Oliveras-Perez
 
 107
 Oliveras-Perez asserts that he should not be held responsible for the drugs seized from Sanchez-Cervantes's barn, and that he should instead only be held responsible for the drugs seized during the controlled buy where he and Cisneros-Silva were arrested. Under U.S.S.G. Sec. 1B1.3(a)(2), a defendant involved in joint criminal activity is accountable for conduct of others that was both in furtherance of the joint criminal activity, and reasonably foreseeable in connection with that criminal activity.
 
 
 108
 Oliveras-Perez argues that although trial testimony supports a finding that he was Sanchez-Cervantes's underling, there is insufficient evidence to prove that Oliveras-Perez knew where his boss hid his large drug stash. Therefore, argues Oliveras-Perez, the drugs seized from Sanchez-Cervantes's hiding place were not foreseeably connected to him and should not have been counted in calculating his offense level.
 
 
 109
 There was significant evidence beyond the controlled buy, however, that linked Oliveras-Perez to Sanchez-Cervantes' drug business. Kathy Daly testified that Oliveras-Perez moved in with her and Sanchez-Cervantes in 1990 and sold cocaine for them. (Govt br. at 10, p 25.) Daly also testified that in 1992, she regularly bought drugs from Sanchez-Cervantes's runner, Oliveras-Perez. (Id. at 12, p 30.) Further, the drug press seized from Oliveras-Perez's house conformed to the pressed kilogram block of cocaine found in the barn.
 
 
 110
 The evidence presented in this case clearly supports the trial court's finding that Oliveras-Perez was responsible under U.S.S.G. Sec. 1B1.3 for the drugs seized from Sanchez-Cervantes's barn. The court did not err in calculating the drug amount attributable to Oliveras-Perez.
 
 2. Wynn
 
 111
 Wynn claims that the district court erred in counting drugs seized from his motel room on February 2, 1993. The amount of methamphetamine seized was 229.76 grams. (Wynn PSR Attachment #1, at 1.) Wynn also contends that it was error for the court to count the drugs found on his person when he was arrested on March 23, 1993, because the indictment charged the conspiracy as ending on March 5, 1993. The amount seized at his arrest was 2.04 grams.
 
 
 112
 The court did not err in counting the methamphetamine seized from Wynn's hotel room during the time of the conspiracy in calculating Wynn's sentence. The circumstances surrounding Wynn's possession of this methamphetamine clearly supported a finding that it was part of the "same course of conduct or common scheme or plan" under U.S.S.G. Sec. 1B1.3(a)(2).
 
 
 113
 As to the drugs seized from Wynn when he was arrested, we need not review this contention. Assuming arguendo that the court erred in counting these drugs, their omission from Wynn's sentence calculation would not change his offense level. See U.S.S.G. Sec. 2D1.1(c)(8) (Level 28 of the Drug Quantity Table) (Nov. 1988 ed.).
 
 M. UPWARD DEPARTURE
 
 114
 The trial court granted the government's request for an upward departure of four levels on Wynn's sentence based on the serious injuries sustained by the driver of a vehicle Wynn struck while transporting drugs in his van.[14]
 
 
 115
 In granting this departure, the court relied on U.S.S.G. Sec. 5K2.2, which allows the court to make an upward departure if "significant physical injury" resulted from the defendant's conduct. That provision states further:
 
 
 116
 When the victim suffers a major, permanent disability and when such injury was intentionally inflicted, a substantial departure may be warranted. If the injury is less serious or if the defendant ... did not knowingly create the risk of harm, a less substantial departure would be indicated.
 
 
 117
 U.S.S.G. Sec. 5K2.2.
 
 
 118
 We review de novo whether the aggravating circumstance identified by the sentencing court as a basis for the departure is a valid legal reason to depart. The court's factual determination that the aggravating circumstance existed is reviewed for clear error. We must also determine the reasonableness of the departure. United States v. Lira-Barraza, 941 F.2d 745, 746-747 (9th Cir. 1991) (en banc).
 
 
 119
 Section 5K2.2 clearly allows for upward departures based on serious injury which occurs as a result of the offense. Wynn does not contest that the injuries sustained in the collision were serious, but he argues that the accident involved here was not connected with the conspiracy.
 
 
 120
 The court found that Wynn was transporting drugs purchased as part of the conspiracy when he hit the other vehicle. Testimony at trial established the following.
 
 
 121
 Wynn and Polsfuss received three-quarters of a pound of methamphetamine from Plasencia-Garcia (via Castillo-Arvizu) just before Christmas 1992. Wynn's accident occurred on Christmas Eve 1992. Wynn told Polsfuss that he had lost the drugs that they had obtained in an accident. Another witness testified that Wynn admitted dumping the drugs in the water at the accident scene. Police discovered a small bag of methamphetamine at the accident scene. All of this occurred during the time of the conspiracy, which the indictment alleged to end on March 5, 1993.
 
 
 122
 The court's factual finding that this accident occurred as part of the conspiracy was not clear error, and the extent of the departure (60 months) was reasonable.
 
 
 123
 N. DRUG DEALING WITHIN 1000 FEET OF A SCHOOL
 
 
 124
 Under U.S.S.G. Sec. 2D1.2, the trial court added one point to Oliveras-Perez's offense level because his possession conviction took place within 1000 feet of a public school. Oliveras-Perez, citing no authority, argues that this enhancement should not be applied to him because the offense occurred on December 30, when school was not in session.
 
 
 125
 We agree with the government that the Guidelines have already taken this argument into consideration. Subpart (a)(1) of section 2D1.2 requires a two point enhancement when the drug dealing activity "directly involv[es] a protected location." Here, the court instead applied subpart (b)(2), which prescribes a one point enhancement for an offense near a protected location. Subpart (b)(2) is identical to subpart (a)(2), except it does not contain the language about direct involvement. We find no error in the court's application of this provision.
 
 III. CONCLUSION
 
 126
 The convictions of Wynn, Oliveras-Perez and Plasencia-Garcia are AFFIRMED. The sentences of Wynn and Oliveras-Perez are AFFIRMED.
 
 
 
 *
 The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this Circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 Wynn, Oliveras-Perez and Plasencia-Garcia were indicted and tried with four other co-defendants. The appeals of those four co-defendants (Santiago Castillo-Arvizu, Juan Sanchez-Cervantes, Adolfo Brahms-Garcia, and Enrique Cisneros-Silva) have been severed
 
 
 [2]
 See affidavit in support of the warrant, asserting that "Avel" (Abel Oliveras-Perez) sells methamphetamine (Oliveras-Perez ER 29-30); and stating that the phone at 79 Lincoln is listed to Juan Cervantes-Sanchez, the person for whom Oliveras-Perez allegedly ran drugs. (Oliveras-Perez ER at 30.) The affidavit also alleges that the day before the warrant was issued, police arrested Oliveras-Perez during the course of a controlled buy and seized 30 grams of methamphetamine from his person. (Id.)
 
 
 [3]
 Wynn makes this argument at pp. 23-25 of his brief, and he incorporates into his argument the arguments made in Cisneros-Silva's brief at pp. 19-23. Oliveras-Perez states in his brief at p. 35 that he "joins in and incorporates by reference all arguments filed by co-defendants which positively affect his case." Thus we consider Oliveras-Perez joined in Wynn's argument on this issue
 
 
 [4]
 Castillo-Arvizu apparently also moved to sever, (see Wynn Blue br. at 23), but his motion is not contained in any of the excerpts of record submitted in this case
 
 
 [5]
 The trial court did not hear argument on these motions. The court orally denied the motions to sever at a pre-trial hearing. (Cisneros-Silva ER at 16.)
 
 
 [6]
 Oliveras-Perez is also joined in this argument. See supra p. 7 n.3. Wynn makes a similar statement joining in to all arguments that positively affect his case. (Wynn Blue br. at 25.) Thus we consider Wynn joined in this argument. Further, the court stated at its hearing on this motion that it considered all the co-defendants joined in the motion. (Plasencia-Garcia ER at 25)
 
 
 [7]
 In Sanchez-Mata, we found insufficient evidence of possession with intent to distribute where, among other factors, the defendant's behavior was "consistent with that of an innocent person having no stake or interest in drug transactions." 925 F.2d at 1168
 
 
 [8]
 Polsfuss was a member of the conspiracy until his arrest in 1993
 
 
 [9]
 In Williams, an informant testified about drug deals with the defendants that took place both prior to and during the period of the conspiracy. We found that the events the informant testified to were "closely linked" to the charged conspiracy, and that the informant's dealings with the defendant were an "important development" in the conspiracy. Williams, 989 F.2d at 1070. We concluded that the balance of this testimony did not constitute Rule 404(b) evidence
 
 
 [10]
 Oliveras-Perez is also joined in this argument. See supra p. 7 n.3
 
 
 [11]
 Plasencia-Garcia cites Schuler, 813 F.2d 978, a case where we found a Fifth Amendment violation when the prosecutor commented on the courtroom behavior of the non-testifying defendant (the defendant laughed when racial and sexual comments he had made during the course of his arrest were repeated by witnesses during the trial). In Schuler we found that, in the absence of a curative instruction, the prosecutor's comments violated the defendant's right not to be convicted except on the basis of evidence adduced at trial. But the comment in question here was directed at the defense attorneys' tactics, and did not point to behavior by the defendants. Although Plasencia-Garcia makes a general statement that these comments violated his Sixth Amendment rights, he cites no Sixth Amendment cases
 
 
 [12]
 We did not reach this question in Patterson because we had already found reversible error on another issue
 
 
 [13]
 Wynn adopts the arguments of Cisneros-Silva, who makes this constitutional argument. (Cisneros-Silva Blue br. at 32-34.)
 
 
 [14]
 The victim's injuries are described in her medical reports, contained in the government's SER at 41-51. She testified at Wynn's sentencing that she has not been able to work since the accident