# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47726-2-II |
| Respondent, | |
| v. | |
| CLABON TERREL BERNIARD, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Clabon Terrel Berniard appeals his convictions and sentence for multiple crimes arising from his participation in a 2010 robbery and murder at the home of James and Charlene Sanders.[1]  Berniard argues that the trial court erred by (1) admitting evidence obtained by an invalid search warrant, (2) admitting hearsay statements that were not made in the course of or in furtherance of a conspiracy, (3) admitting a video recording obtained in violation of Washington's privacy act, (4) imposing an exceptional sentence, and (5) improperly instructing the jury on firearm sentencing enhancements.  We affirm Berniard's convictions and sentence, and we waive appellate costs.

### FACTS

### I. BACKGROUND

In 2014, this court decided an appeal arising from the same crimes.  *State v. Berniard*, 182 Wn. App. 106, 327 P.3d 1290 (2014).

---

[1] We refer to James and Charlene Sanders by their first names to avoid confusion; we mean no disrespect.

Following a home invasion robbery in which one participant shot and killed James, the State charged Joshua Reese, Amanda Knight, Kiyoshi Higashi, and an unidentified fourth participant with a number of crimes. Ultimately, the State charged Berniard, as the fourth participant . . . . . The trial court severed the cases, and Berniard was tried separately.

The victims' testimony at Bernard's trial established that Knight and Higashi initially obtained entrance to the Sanderses's home posing as potential buyers of a ring the Sanderses had advertised on the website Craigslist. Verbatim Report of Proceedings (VRP) at 900-03. Higashi then drew a gun and ordered James and Charlene to lie face-down on the floor. They complied, and Knight and Higashi restrained their hands with plastic zip ties, taking the wedding rings from Charlene's and James's fingers.

On a signal from Knight, two additional intruders, wearing masks and armed with guns, entered the home and proceeded to the second story, where they ordered the Sanderses's two children, JS and CK,[2] downstairs. One of these masked intruders, identified by the victims as "the mean one," demanded the location of the Sanderses's safe, threatening to kill the victims. VRP at 909-10, 932. He kicked Charlene in the head, pointed a gun at her head, and began counting backward from three.[3]

At that point, Charlene told the perpetrators that the safe was in the garage. As Higashi and another intruder took James toward the garage, he broke free from the zip ties and a fight ensued. JS, who remained unrestrained, joined the struggle, and in the course of the fight the perpetrators beat JS severely with a pistol and shot James repeatedly, killing him. The four then fled the scene.

182 Wn. App. at 110-12.

This court reversed Berniard's convictions and remanded for a new trial. 182 Wn. App. at 132. On remand, the State filed a third amended information charging Berniard with first degree murder (count I),[4] first degree robbery of J.S. (count II),[5] second degree assault of J.S.

---

[2] We use initials to identify minor victims.

[3] This masked intruder was later identified as Berniard.

[4] RCW 9A.32.030(1)(c).

[5] RCW 9A.56.200(1)(a)(iii).

(count III),[6] first degree robbery of Charlene (count IV),[7] second degree assault of Charlene (count V),[8] and first degree burglary (count VI).[9] The State sought firearm sentencing enhancements, alleging aggravating factors of deliberate cruelty and a high degree of sophistication or planning on all counts.

## II. PRETRIAL MOTIONS

Prior to trial, Berniard moved to suppress evidence, including his and his codefendants' cell phone records and a video recording of a conversation between his family members. The State moved to admit Higashi's statements to his former girlfriend, Jenna Ford, as statements of a coconspirator.

A.    *Phone Records*

Berniard moved to suppress the subscriber and account information, toll and calling records, and tower information for four cell phone numbers, including a prepaid cell phone listed with a "504" area code. The three other cell phone numbers belonged to Berniard's three codefendants. Berniard argued that the search warrant was defective because the supporting declaration failed to state to whom police believed the cell phones belonged or what led police to believe the cell phones identified contained evidence of the Sanderses' home invasion.

---

[6] RCW 9A.36.021(1)(c).

[7] RCW 9A.56.200(1)(a)(iii).

[8] RCW 9A.36.021(1)(c).

[9] RCW 9A.52.020.

At the suppression hearing, Berniard argued that he had standing to challenge the search of the cell phone records because he had a possessory and a privacy interest in the records. In addition, Berniard made an offer of proof that the 504 number was his cell phone number. The trial court accepted Berniard's offer of proof and granted his motion to suppress.

The State filed a motion to reconsider the admissibility of the phone records. The trial court granted the State's motion to reconsider and ultimately admitted Berniard's and his codefendants' cell phone records.

B.      *Video Recording*

A few days after the Sanderses' home invasion, California police apprehended Higashi, Knight, and Reese. *Berniard*, 182 Wn. App. at 112. The three made statements implicating themselves and a fourth participant later identified as Berniard. 182 Wn. App. at 112.

Sabra Gertsch, a news anchor with KOMO 4 TV in Seattle, learned that Berniard had been identified as the fourth participant in the Sanderses' home invasion. Gertsch then traveled to Berniard's home. Berniard's aunt answered the door, and Gertsch, wearing KOMO 4 apparel, identified herself and her cameraman. Berniard's aunt invited Gertsch into the family home, and Gertsch's cameraman brought his large, commercial TV camera inside. While speaking to Berniard's aunt, Gertsch revealed that a warrant had been issued for Berniard's arrest.

Berniard's aunt told Berniard's mother, Joan Berniard, why Gertsch and her cameraman were at the home, and Gertsch began talking to Joan in the living room.[10] While Gertsch spoke with Joan, Berniard's sister, Lacey Berniard, walked into the living room. Lacey has

---

[10] We use first names as necessary to avoid confusion. We intend no disrespect.

developmental delays. While the cameraman was still recording, Lacey told Joan, "I know what [Gertsch] is talking about." 2 Verbatim Report of Proceedings (VRP) at 319. Then, Lacey said she overhead Berniard discussing the robbery with their sister. This statement was recorded.

Pretrial, Berniard moved to suppress the KOMO 4 TV video recording of Joan and Lacey's conversation, arguing that the recording violated Washington's privacy act. The trial court denied Berniard's motion, determining that the video camera was readily apparent and that Joan and Lacey should have known their conversation was being recorded.

C.    *Higashi's Statements*

The night of the Sanderses' home invasion, Higashi went to Ford's home. There, Higashi told Ford that he, Knight, Reese, and a man named "XYG" found an ad on Craigslist for a ring and that they decided to rob the owners. He further explained that the four ransacked the Sanderses' home, that he shot Jim Sanders multiple times, and that XYG "pistol whipped the youngest kid." 12 Verbatim Transcript of Proceedings (VTP) at 1040, 1041.

Ford instructed Higashi that "if they wanted to get away [with] what they had just done, they should all get together and make a story." 13 VTP at 1097. Higashi called Knight and Reese, and they arrived at Ford's home. Ford told them to throw away any evidence that may link the three to the Sanderses' home. Ford helped Higashi, Knight, and Reese dispose of evidence, but she did not know about their plan to flee the state and sell the property obtained from the Sanderses' residence.

The State moved to admit Higashi's statements to Ford as statements of a coconspirator. The trial court granted the State's motion, stating:

> There's no question we have a conspiracy. The conspiracy is to commit robbery. But the robbery just doesn't stop. It's what you do after the robbery is still part of the conspiracy of what they were trying to do . . . .
>
> "And the statement in question describes the defendant's role in the conspiracy or implicates the defendant in some manner. . . ."
>
> . . . .
>
> You argue that [Higashi's statement] wasn't [in the course of the conspiracy] and it's separated and different. I don't think that's the case. I think the conspiracy continues until it's done . . . . And that's going to be my finding. I think that the statements are admissible.

7 VTP at 164-65.

### III. TRIAL & SENTENCING

At trial, witnesses testified to the above facts. Then, the trial court provided the jury with the following firearm enhancement instruction:

> In order to answer the special verdict forms "yes," all twelve of you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you do not unanimously agree that the answer is "yes" then the presiding juror should sign the section of the special verdict form indicating that the answer has been intentionally left blank.

Clerk's Papers (CP) at 280. The special verdict forms included a blank space for the jurors to indicate their answer. The blank was followed by: "Write 'yes' if unanimous agreement that this is the correct answer." CP at 297, 298. Berniard did not object to the court's instruction.

The jury found Berniard guilty of all charges, and it answered each special verdict form for the firearm enhancements in the affirmative. In addition, the jury returned special verdict forms determining that Berniard manifested deliberate cruelty in the commission of the first degree robbery, second degree assault, and first degree burglary charges. The jury also returned special verdict forms finding that the first degree robbery, first degree assault of Charlene, and first degree burglary charges involved a high degree of sophistication or planning.

6

The trial court sentenced Berniard to a total of 1,172 months' confinement. Berniard's sentence included a 312-month firearm enhancement and 312-month exceptional sentence. Berniard appeals.

ANALYSIS

I. MOTION TO SUPPRESS

Berniard argues the trial court erred by denying his motion to suppress evidence of his cell phone records that were obtained by a defective search warrant.[11] The State argues that Berniard does not have standing to challenge the search warrant. We hold that Berniard has standing to challenge admission of his own phone records, but the trial court's ruling denying his motion to suppress was harmless beyond a reasonable doubt.

A.    *Standing*

To determine whether a defendant is entitled to challenge the scope of a search warrant, we must first decide whether he has standing to qualify for protection under the Fourth Amendment and article I, section 7 of the Washington Constitution. *State v. Francisco*, 107 Wn. App. 247, 252, 26 P.3d 1008 (2001). We review standing to challenge a search or seizure de novo. *State v. Link*, 136 Wn. App. 685, 692, 150 P.3d 610, *review denied*, 160 Wn.2d 1025, 163 P.3d 794 (2007).

Generally, standing to challenge a search or seizure under the Fourth Amendment and article I, section 7 requires that a defendant have a legitimate expectation of privacy in the place searched or item seized. *State v. Libero*, 168 Wn. App. 612, 616, 277 P.3d 708 (2012). It is well

---

[11] In Berniard's brief, he argues that the trial court erred by denying his motion to suppress evidence of his and his codefendants' cell phone records. At oral argument, Berniard conceded that he does not have standing to challenge the search of his codefendants' cell phone records.

established that article I, section 7 of the Washington Constitution is qualitatively different from the Fourth Amendment and provides greater protections to Washington citizens. *State v. Gunwall*, 106 Wn.2d 54, 66, 720 P.2d 808 (1986). Article I, section 7 "'is grounded in a broad right to privacy' and protects citizens from governmental intrusion into their private affairs without the authority of law." *State v. Hinton*, 179 Wn.2d 862, 868, 319 P.3d 9 (2014) (quoting *State v. Chacon Arreola*, 176 Wn.2d 284, 291-92, 290 P.3d 983 (2012)). Accordingly, its private affairs inquiry is much broader than the Fourth Amendment's reasonable expectation of privacy inquiry. 179 Wn.2d at 868.

Under article I, section 7, a search occurs when the government disturbs "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984). To determine whether the government intrudes on a private affair, we look to the nature and extent of the information sought and at the historical treatment of the privacy interests asserted. *State v. Miles*, 160 Wn.2d 236, 244, 156 P.3d 864 (2007).

Telephonic and electronic communications are strongly protected under Washington law. *Gunwall*, 106 Wn.2d at 66. In *State v. Gunwall*, the Washington Supreme Court determined that a telephone subscriber has a constitutionally protected privacy interest in the records of the calls he makes. 106 Wn.2d at 67-68. While the court recognized that many federal courts have held that the Fourth Amendment does not protect telephone billing records, it noted that there was a "long history and tradition of strict legislative protection of telephonic and other electronic communications in this state." 106 Wn.2d at 66.

8

In reaching its conclusion, the court determined that

> [a] telephone subscriber . . . has an actual expectation that the dialing of telephone numbers . . . will be free from governmental intrusion. A telephone is a necessary component of modern life. It is a personal and business necessity indispensable to one's ability to effectively communicate in today's complex society. When a telephone call is made, it is as if two people are having a conversation in the privacy of the home.

106 Wn.2d at 67 (quoting *People v. Sporleder*, 666 P.2d 135, 141 (Colo. 1983)).

Further, the court stated that it was "'unrealistic to say that the cloak of privacy has been shed because the telephone company and some of its employees are aware of [a subscriber's call records]. . . . [T]he disclosure has been made for a limited business purpose and not for release to other persons for other reasons.'" 106 Wn.2d at 68 (quoting *State v. Hunt*, 91 N.J. 338, 347, 450 A.2d 952 (1982)). Similarly, telephone subscribers with unpublished listings have a legitimate expectation of privacy in their billing and toll records. *State v. Butterworth*, 48 Wn. App. 152, 155-57, 737 P.2d 1297 (1987). By requesting an unpublished phone number listing, a subscriber takes steps to ensure *greater* privacy protections than other telephone customers. 48 Wn. App. at 155-57.

Here, police filed a search warrant seeking the subscriber and account information, toll and calling records, and tower information for the 504 number. A magistrate issued the search warrant, and Berniard filed a motion to suppress all evidence obtained by the warrant.

Berniard made an offer of proof that the 504 number included in the search warrant was his cell phone number. Berniard argued that the 504 number was exclusively used by him, as demonstrated by the number of phone calls made to his friends and family. The trial court ultimately denied Berniard's motion to suppress.

The 504 number was associated with a prepaid Sprint cell phone registered to "Terry Brown." 16 VTP at 1593. Sprint does not ask for subscriber information for prepaid cell phones. As a result, the name of a subscriber associated with a prepaid Sprint cell phone may not be accurate. The address associated with the 504 number was the default address for all Sprint prepaid cell phones.

The State asks that this court adopt the United States Court of Appeals for the Sixth Circuit's decision in *United States v. Skinner*, 690 F.3d 772 (6th Cir. 2012). *Skinner* is factually and legally distinguishable. In *Skinner*, the Sixth Circuit determined that using a cell phone's data to trace its owner did not violate the defendant's reasonable expectation of privacy. 690 F.3d at 774-75. No such search took place here. The State also appears to argue that *Skinner* suggests that prepaid cell phones are afforded less protection than postpaid cell phones. This interpretation, however, does not consider that article I, section 7 provides greater protections to Washington citizens than comparable federal statutes and rulings. *Gunwall*, 106 Wn.2d at 66.

Berniard has a legitimate and protected privacy interest in his own toll and calling records, as well as his account and subscriber information. As recognized in *Gunwall*, a phone is a necessary part of modern life, and phone communications are strongly protected in Washington. 106 Wn.2d at 67. Berniard's privacy interest is not undermined because his prepaid cell phone was not registered in his name. Instead, Berniard's choice to not provide his subscriber information shows that he took steps to ensure even greater privacy protections. *Butterworth*, 48 Wn. App. at 155-57. Because Berniard has a constitutionally protected privacy interest in the cell phone records subject to the search warrant, he has standing to challenge the scope of the warrant.

B.      *Harmless Error*

The State argues that any error in admitting the phone records was harmless. We agree.

We assume without deciding that the search warrant for Berniard's cell phone records was invalid. We apply a harmless error analysis when the trial court admits evidence that is a product of an invalid warrant. *State v. Keodara*, 191 Wn. App. 305, 317, 364 P.3d 777 (2015). Admission of evidence obtained in violation of the state constitution is an error of constitutional magnitude. 191 Wn. App. at 317. An error of constitutional magnitude can be harmless if we are convinced beyond a reasonable doubt that "any reasonable jury would have reached the same result without the error." *State v. Smith*, 148 Wn.2d 122, 139, 59 P.3d 74 (2002). Constitutional error is presumed to be prejudicial, and the State has the burden of proving the error was harmless. *Keodara*, 191 Wn. App. at 317-18.

While Berniard's phone records established that he was involved with Higashi, Knight, and Reese and that he was present at the Sanderses' home when the robbery and murder were committed, this evidence was cumulative. At trial, Charlene made an in-court identification of Berniard. Charlene also testified that Berniard hit her son, J.S., in the head with his firearm and kicked her in the head while demanding to know the location of the family's safe. In addition, Berniard's sister, Lacey, testified that she overheard Berniard talking about a robbery, and Berniard's codefendants' cell phone records established that he was in contact with Knight and Higashi throughout the evening of the robbery and murder. A reasonable jury would have reached the same result without Berniard's cell phone records. Therefore, the trial court's error in admitting Berniard's cell phone records was harmless beyond a reasonable doubt.

## II. HIGASHI'S STATEMENTS TO FORD

Berniard also argues the trial court abused its discretion by admitting hearsay statements made by Higashi because the statements were not made during the course of or in furtherance of a conspiracy. We disagree.

A trial court's interpretation of the rules of evidence is a question of law we review de novo. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). Its application of the rules to particular facts is reviewed for abuse of discretion. 150 Wn.2d at 17. A trial court abuses its discretion when its evidentiary decision is manifestly unreasonable or based on untenable grounds. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007).

Under ER 801(d)(2)(v), a statement is not hearsay if it is offered against a party and is a statement by a coconspirator made "during the course and in furtherance of the conspiracy." Before admitting coconspirator statements, the trial court must make an independent determination that a conspiracy existed and that the defendant was a member of the conspiracy. *State v. Halley*, 77 Wn. App. 149, 152, 890 P.2d 511 (1995). Where, as here, Washington's rules of evidence mirror their federal counterparts, we may look to federal case law interpreting the federal rules as persuasive authority. *In re Detention of Pouncy*, 168 Wn.2d 382, 392, 229 P.3d 678 (2010).

A conspiracy requires "'concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.'" *State v. Sanchez-Guillen*, 135 Wn. App. 636, 643, 145 P.3d 406 (2006) (quoting *State v. Barnes*, 85 Wn. App. 638, 664, 932 P.2d 669 (1997)). A conspiracy ends when its objectives have either failed

or been achieved. Fed. R. Evid. 801(d)(2)(E) advisory committee's note, 56 F.R.D. 183, 299 (1973).

Generally, courts interpret the "in furtherance" requirement broadly. *State v. King*, 113 Wn. App. 243, 280, 54 P.3d 1218 (2002). When determining whether a statement is made in furtherance of a conspiracy, courts examine the declarant's intent in making the statement and not the statement's actual effect in advancing the goals of the conspiracy. *United States v. Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991).

Statements made to encourage further participation or to inform a coconspirator about the status of the conspiracy are sufficient. *King*, 113 Wn. App. 280. In addition, statements made by a coconspirator in "an effort to conceal the conspirators' illegal activities" are made in furtherance of the conspiracy. *United States v. Williams*, 989 F.2d 1061, 1069 (9th Cir. 1993). However, casual and retrospective statements about past events are admissible only if they facilitate the criminal activity of the conspiracy. *King*, 113 Wn. App. at 281. Finally, mere confessions and narrative declarations of a coconspirator are not statements made in furtherance of a conspiracy. *United States v. Fielding*, 645 F.2d 719, 726 (9th Cir. 1981).

Prior to trial, the State moved to admit Higashi's statements to Ford as statements of a coconspirator. The trial court granted the State's motion, stating:

> There's no question we have a conspiracy. The conspiracy is to commit robbery. But the robbery just doesn't stop. It's what you do after the robbery is still part of the conspiracy of what they were trying to do . . . .
> "And the statement in question describes the defendant's role in the conspiracy or implicates the defendant in some manner. . . ."
> . . . .
> You argue that [Higashi's statement] wasn't [in the course of the conspiracy] and it's separated and different. I don't think that's the case. I think the conspiracy continues until it's done . . . . And that's going to be my finding. I think that the statements are admissible.

13

7 VTP at 164-65.

At trial, Ford testified that while at her home on the evening of April 28, 2010, Higashi stated that he, Knight, Reese, and a man named XYG found an ad on Craigslist for a ring and that they decided to rob the owners. He further explained that the four ransacked the Sanderses' home, that he shot Jim Sanders multiple times, and that XYG "pistol whipped the youngest kid." 12 VTP at 1040-41.

Then, Ford instructed Higashi that "if they wanted to get away [with] what they had just done, they should all get together and make a story." 13 VTP at 1097. Higashi called Knight and Reese, and they arrived at Ford's home. Ford told them to throw away any evidence that may link the three to the Sanderses' home, and she helped Higashi, Knight, and Reese dispose of evidence of the home invasion.

Here, the parties do not dispute that a conspiracy between Berniard and his three codefendants existed. Instead, Berniard argues that the conspiracy no longer existed at the time of Higashi's statements to Ford because the robbery was complete. Although the criminal act of robbery was complete at the time of Higashi's statements, the criminal objectives of the conspiracy—to successfully escape and make a profit by illegal means—were not yet achieved.[12] As a result, Higashi's statements to Ford were made in the course of the conspiracy.

---

[12] *See United States v. Sears*, 663 F.2d 896, 905 (9th Cir. 1981) (holding that statements made while the defendants were escaping from a robbery were in the course of and in furtherance of the conspiracy because the statements served to further the objectives of the conspiracy—to rob and escape successfully); *Atkins v. United States*, 307 F.2d 937, 940 (9th Cir. 1962) (holding that statements relating to the division of profits were admissible because the criminal aim of the conspiracy was not to commit robbery but to make a profit by illegal means).

In addition, Higashi's statements were made in furtherance of the conspiracy. It is reasonable to interpret Higashi's statements to Ford about the crimes he and his coconspirators committed as an attempt to encourage her participation in the conspiracy. Higashi's retrospective account of the crime may have been made to encourage Ford to help him and his codefendants successfully escape and make a profit from the items stolen from the Sanderses' home. Accordingly, the trial court's conclusion that the statement furthered the conspiracy and its application of the rules of evidence to the facts at hand was not manifestly unreasonable or based on untenable grounds. Therefore, the trial court did not abuse its discretion in admitting Higashi's statements.

### III. PRIVACY ACT

Berniard also argues the trial court erred in denying his motion to suppress a video recording obtained in violation of Washington's privacy act because the recorded conversation was private. We disagree.

Washington's privacy act is "one of the most restrictive [privacy statutes] in the nation." *State v. Townsend*, 147 Wn.2d 666, 672, 57 P.3d 225 (2002). The privacy act generally prohibits the recording of any private communication without the consent of all parties involved in the communication. *See* chapter 9.73 RCW. "Whether a particular conversation is private is a question of fact, but where the facts are undisputed and reasonable minds could not differ, the issue may be determined as a matter of law." *State v. Clark*, 129 Wn.2d 211, 225, 916 P.2d 384 (1996). We review questions of law de novo. *State v. Kipp*, 179 Wn.2d 718, 726, 317 P.3d 1029 (2014).

15

To violate the privacy act, there must be (1) a private communication transmitted by a device that was (2) intercepted or recorded by use of (3) a device designed to record and/or transmit (4) without the consent of all parties to the private communication. *State v. Christensen*, 153 Wn.2d 186, 192, 102 P.3d 789 (2004) (citing RCW 9.73.030). Recordings or information obtained in violation of the privacy act are inadmissible in court. RCW 9.73.050.

The protections of the privacy act apply only to private communications. *Clark*, 129 Wn.2d at 224. The privacy act does not define the term "private," but it is to be given its ordinary meaning: "belonging to one's self . . . secret . . . intended only for the persons involved (a conversation)." *Clark*, 129 Wn.2d at 225. A communication is private if the parties manifest a subjective intention that it be private and if the parties' expectation is reasonable. *Townsend*, 147 Wn.2d at 673. To determine the reasonableness of a party's privacy expectation, we consider "the duration and subject matter of the communication, the location of the communication, and the presence of potential third parties." *State v. Roden*, 179 Wn.2d 893, 900, 321 P.3d 1183 (2014).

The reasonable privacy expectation standard requires a case-by-case consideration of all the facts. *Kipp*, 179 Wn.2d at 729. Normally, a private home is afforded maximum privacy protection. 179 Wn.2d at 731. However, that a conversation takes place with the public is sufficient to find that a conversation is not private, even if the conversation takes place inside a private home. *Clark*, 129 Wn.2d at 226. "[T]he presence of one or more third parties . . . means that the conversations were not private in any ordinary or usual meaning of that word." 129 Wn.2d at 228.

16

Here, Berniard moved to suppress the news station video interview of his mother, Joan, and his sister, Lacey, who has developmental delays. Berniard argued that the video recording violated Washington's privacy act because the video recorded a private conversation between Joan and Lacey without their express consent.

When Gertsch, a news anchor with KOMO 4 TV in Seattle, learned that Berniard had been identified as the fourth participant in the Sanderses' home invasion she went to his home. Gertsch identified herself and her cameraman to Berniard's aunt who then invited her into the home.

Berniard's aunt told Joan why Gertsch and her cameraman were at the home, and Gertsch began talking to Joan in the living room. The cameraman had a large commercial TV camera mounted on a tripod, pointed at Joan. While Gertsch interviewed Joan, Lacey walked into the living room and told Joan, "I know what [Gertsch] is talking about." 2 VRP at 319. Then, Lacey was recorded saying she overhead Berniard discussing the robbery with their sister.

While Lacey's disclosure certainly concerned a private matter, she did not have a reasonable expectation of privacy in her conversation with Joan. Even if Lacey had a subjective expectation of privacy in the conversation, her expectation was not objectively reasonable because Gertsch and her cameraman were present during the disclosure. Because Lacey's conversation took place in the presence of third parties, the conversation cannot be said to be "private in any ordinary or usual meaning of the word," even though the communication took place within a private home. *Clark*, 129 Wn.2d at 228. Further, the commercial TV camera pointed at Lacey and Joan while Joan spoke to Gertsch reduced any expectation of privacy in the conversation. Accordingly, the video recording did not violate the privacy act because the

17

communication therein was not private. The trial court did not err in denying Berniard's motion to suppress the video recording.

## IV. CUMULATIVE ERROR

Berniard also argues that the cumulative effect of the trial court's errors denied him a fair trial. We disagree.

The cumulative error doctrine applies when a trial is affected by several errors that, standing alone, may not be sufficient to justify reversal. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Cumulative error requires reversal when the combination of errors denies the defendant a fair trial. 141 Wn.2d at 929. Reversal is not required when there are few or no errors and the errors, if any, have little to no effect on the outcome of the trial. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

As discussed above, Berniard fails to show that multiple errors occurred in his trial. The sole error was the trial court's admission of Berniard's phone records. Because Berniard establishes, at most, a single harmless error, we reject his cumulative error claim.

## V. EXCEPTIONAL SENTENCE

Berniard also argues the trial court erred in imposing an exceptional sentence because the aggravating factors found by the jury were inherent to the crimes charged and were not atypical. We disagree.

Under the Sentencing Reform Act of 1981, a trial court must impose a sentence within the standard range for a given offense. *State v. Jennings*, 106 Wn. App. 532, 555, 24 P.3d 430 (2001). However, a court may impose an exceptional sentence above the standard range if it finds "substantial and compelling reasons" for doing so. *State v. Davis*, 146 Wn. App. 714, 719,

192 P.3d 29 (2008). Aggravating factors that support a sentence above the standard range include (1) when the defendant's conduct manifests deliberate cruelty to the victim and (2) the offense involved a high degree of sophistication or planning. RCW 9.94A.535(3)(a), (m). We review the trial court's reasons for imposing an exceptional sentence de novo. *State v. Ferguson*, 142 Wn.2d 631, 646, 15 P.3d 1271 (2001).

To determine whether an aggravating factor supports departure from the standard sentencing range, we apply a two-part test: "(1) The trial court may not base an exceptional sentence on factors the Legislature necessarily considered in establishing the standard sentencing range; and (2) the aggravating factor must be sufficiently substantial and compelling to distinguish the crime in question from others in the same category." *Jennings*, 106 Wn. App. at 555. Factors inherent in the crime, because they were necessarily considered by the Legislature, may not be relied on to justify an exceptional sentence because "[a]n exceptional sentence is not justified by mere reference to the very facts which constituted the elements of the offense proven at trial."[13] *Ferguson*, 142 Wn. App. at 648.

Here, the jury returned guilty verdicts for all six of Berniard's charges. The jury returned special verdict forms determining that Berniard manifested deliberate cruelty in the commission of the first degree robbery, second degree assault, and first degree burglary charges. The jury

---

[13] Berniard also argues the State was required to present the jury with comparative evidence of other first degree robberies, second degree assaults, and first degree burglaries to support its finding that the aggravating factors were atypical. However, an atypical crime warranting an exceptional sentence distinguishes itself from crimes of the same category without extrinsic evidence. *State v. Tili*, 148 Wn.2d 350, 369, 60 P.3d 1192 (2003) ("[T]hose factors that are inherent in the particular class of crimes at issue may not serve to distinguish defendant's conduct from what is 'typical' for that crime and may not, therefore, serve as justification for an exceptional circumstance.").

also returned special verdict forms finding that the first degree robbery, first degree assault of Charlene, and first degree burglary charges involved a high degree of sophistication or planning. The trial court imposed an exceptional sentence of 1,172 months.

A.      *Deliberate Cruelty*

When a defendant's conduct during the commission of a crime manifests deliberate cruelty toward the victim, the trial court may impose an exceptional sentence. RCW 9.94A.535(3)(a). "Deliberate cruelty consists of gratuitous violence or other conduct that inflicts physical, psychological, or emotional pain as an end in itself." *State v. Tili*, 148 Wn.2d 350, 369, 60 P.3d 1192 (2003). To justify an exceptional sentence, the cruelty must go beyond what is normally associated with the commission of the charged offense or what is inherent in the elements of the offense. 148 Wn.2d at 369. Further, the deliberate cruelty alleged must be atypical of the crime charged. *State v. Delarosa-Flores*, 59 Wn. App. 514, 518, 799 P.2d 736 (1990).

Here, the jury determined Berniard committed the charged offenses with manifest deliberate cruelty toward the victims, and the trial court entered findings of fact justifying an exceptional sentence. The jury heard evidence that Berniard was armed, held the Sanders children at gunpoint, cursed at and threatened Charlene in an effort to obtain the combination to the family safe, hit J.S. in the head with his firearm multiple times, and "kicked Charlene Sanders in the head and then put his firearm to the back of her head, counting down as if he was going to kill her." CP at 342.

Berniard made multiple threats of death, hit J.S. and Charlene multiple times, and helped to restrain the Sanders family. Generally, only the threat of force or one blow is necessary to

20

charge first degree robbery, second degree assault, and first degree burglary. *See State v. Sims*, 67 Wn. App. 50, 61, 834 P.2d 78 (1992). Accordingly, Berniard's conduct went beyond the elements of the charged offenses and was atypical. Therefore, the trial court's imposition of an exceptional sentence was justified, and the trial court did not err in imposing Berniard's sentence.

B.      *Sophistication or Planning*

To justify an exceptional sentence on the basis of the defendant's high degree of sophistication or planning, the sophistication must be "'of a kind not usually associated with the commission of the offense[s] in question.'" *State v. Dunaway*, 109 Wn.2d 207, 219, 743 P.2d 1237 (1987) (alteration in original) (quoting *State v. Payne*, 45 Wn. App. 528, 531, 726 P.2d 997 (1986)); *see* RCW 9.94A.535(3)(d)(iii). To determine that an aggravating factor applies to an accomplice, the jury must determine that the defendant had some knowledge that informs that aggravating factor. *State v. Hayes*, 182 Wn.2d 556, 566, 342 P.3d 1144 (2015).

"Planning a criminal act in a manner both qualitatively and quantitatively in excess of that necessary to meet the elements inherent in the crime is a factor which may be considered in justifying an exceptional sentence." *State v. Ross*, 71 Wn. App. 556, 564, 861 P.2d 473 (1993), *amended*, 71 Wn. App. 556, 883 P.2d 329 (1994). Further, sophistication in planning that is beyond what is necessary to commit the crime supports an exceptional sentence. 71 Wn. App. at 564.

The jury heard evidence that Berniard and his codefendants targeted the Sanders family after discovering an ad on Craigslist for an expensive ring, planned a ruse to gain entry into the Sanderses' home, and used an open phone line and Bluetooth technology to stay in contact

21

throughout the home invasion. As a result, the jury found, and the trial court agreed, that Berniard used a high degree of sophistication or planning that went beyond the elements of second degree assault, first degree robbery, and first degree burglary. In addition, the trial court and the jury determined that Berniard had knowledge of the sophistication and planning of the home invasion.

Here, the crime exhibited a degree of sophistication and planning beyond that typical of assault, robbery, or burglary. Berniard and his codefendants targeted the Sanders family and acted in concert to invade their home. They wore masks, gathered the family in the same room, tied them up, and ransacked the home while Berniard and a codefendant used threats to gather information about where valuables were hidden. The home invasion demonstrated a level of organization that could only be achieved by sophisticated planning prior to the crime. The sophistication and planning is imputed on Berniard as an accomplice because he had knowledge of the plan to rob the Sanderses. Accordingly, the imposition of an exceptional sentence on the basis of sophistication or planning was justified. Therefore, the trial court did not err in imposing Berniard's sentence.

C. *Void for Vagueness*

In addition, Berniard argues that the aggravating factors were unconstitutionally vague because no evidence of atypical crimes was presented. We disagree.

The due process vagueness doctrine requires that criminal statutes be specific enough to give citizens fair notice of what conduct it proscribes. *State v. Bahl*, 164 Wn.2d 739, 752-53, 193 P.3d 678 (2008). In addition, criminal statutes must "provide ascertainable standards of guilt to protect against arbitrary arrest and prosecution." *State v. Baldwin*, 150 Wn.2d 448, 458,

78 P.3d 1005 (2003). A statute that fails to meet these two requirements is unconstitutionally vague. *Bahl*, 164 Wn.2d at 753.

RCW 9.94A.535 provides that the trial court must impose a standard range sentence unless substantial and compelling reasons justify an exceptional sentence. The sentencing guideline statutes do not define criminal conduct or allow for arbitrary arrest and prosecution. *Baldwin*, 150 Wn.2d at 459. Laws that govern particular decisions given particular facts can create a liberty interest, but laws granting a significant degree of discretion cannot. *State v. Duncalf*, 164 Wn. App. 900, 911-12 n.2, 267 P.3d 414 (2011). Therefore, "the due process considerations that underlie the void-for-vagueness doctrine have no application in the context of sentencing guidelines." *Baldwin*, 150 Wn.2d at 459.

Because the void-for-vagueness doctrine does not apply to the sentencing guidelines, Berniard's claim is without merit. It is "[f]undamental . . . that a court is free to exercise discretion in fashioning a sentence." *Baldwin*, 150 Wn.2d at 460. The sentencing guidelines are designed to structure the trial court's discretionary sentencing decisions. *See* 150 Wn.2d at 461. As a result, the exceptional sentencing guidelines do not require that a particular sentence be imposed. Therefore, the aggravating factors found by the court in imposing an exceptional sentence are not unconstitutionally vague.

## VI. FIREARM ENHANCEMENT INSTRUCTIONS

Berniard also argues that the trial court committed a manifest error affecting a constitutional right by instructing the jury on the firearm enhancements because the instruction and special verdict forms failed to tell the jury that it could return a "no" verdict. Specifically, Berniard argues the trial court's instruction was a manifest constitutional error because it

lowered the State's burden of proof and was an improper comment on the evidence. The State

argues Berniard waived this point of appeal. We agree with the State.

The failure to timely object usually waives a claim of instructional error on appeal. RAP

2.5(a); *State v. Williams*, 159 Wn. App. 298, 312, 244 P.3d 1018, *review denied*, 171 Wn.2d

1025 (2011). A defendant may, however, raise a claim of error for the first time on appeal if it is

a manifest error affecting a constitutional right. RAP 2.5(a)(3); *State v. Gordon*, 172 Wn.2d 671,

676, 260 P.3d 884 (2011). To demonstrate manifest error, the defendant must show actual

prejudice by identifying a constitutional error and showing that the alleged error actually affected

his rights at trial. *Gordon*, 172 Wn.2d at 676. To determine if the defendant claims a manifest

constitutional error, we preview the merits of the defendant's claim to see if it would succeed.

*State v. Kirwin*, 165 Wn.2d 818, 823, 203 P.3d 1044 (2009).

We review alleged errors of law in jury instructions de novo. *State v. Fleming*, 155 Wn.

App. 489, 503, 228 P.3d 804 (2010). Jury instructions are sufficient when they allow each party

to argue its theory of the case, are not misleading, and inform the jury of the applicable law. 155

Wn. App. at 503-04. In addition, a jury must unanimously find beyond a reasonable doubt any

aggravating circumstance that increases the penalty for a crime. *State v. Guzman Nuñez*, 174

Wn.2d 707, 712, 285 P.3d 21 (2012). Unanimity is required to either answer "yes" or "no" on a

special verdict form for an aggravating factor. 174 Wn.2d at 716-17.

Berniard's charges for first degree murder and first degree robbery carried firearm

enhancements. For the firearm enhancements, the trial court instructed the jury:

> If you find the defendant guilty of a specific crime, you will then use the special
> verdict form for that count. In order to answer the special verdict forms "yes," all
> twelve of you must unanimously be satisfied beyond a reasonable doubt that "yes"
> is the correct answer. If you do not unanimously agree that the answer is "yes" then

the presiding juror should sign the section of the special verdict form indicating that the answer has been intentionally left blank.

CP at 280. The special verdict forms included a blank space for the jurors to indicate their answer. The blank was followed by: "Write 'yes' if unanimous agreement that this is the correct answer." CP at 297, 298. Berniard did not object, and the jury found that the firearm enhancement applied to both charges.

The State argues the trial court's enhancement instruction was not improper because the instruction is similar to the instruction in *State v. Brett*, 126 Wn.2d 136, 892 P.2d 29 (1995), which was endorsed in *Guzman Nuñez*. 174 Wn.2d at 719. The instruction here, however, is distinguishable. In *Brett*, the trial court instructed the jury that it "must unanimously agree upon which, if any, of the aggravating circumstances set forth . . . [was] proved beyond a reasonable doubt." 126 Wn.2d at 173. The jury was then instructed to indicate "yes" or "no" according to the unanimous decision it reached. 126 Wn.2d at 173. If, however, the jury was unable to reach a unanimous decision, it was instructed to leave the special verdict form blank. 126 Wn.2d at 173. The *Guzman Nuñez* court concluded that because the *Brett* instruction stated that the jury could leave the special verdict form blank, it was a more accurate statement of the State's burden of proof. 174 Wn.2d at 719.

Here, the trial court instructed the jury only to answer the special verdict forms if it unanimously concluded that Berniard was armed with a firearm at the time of the offenses. While the trial court properly instructed the jury that it may leave the special verdict forms blank if it did not unanimously agree that the answer was "yes," it did not instruct the jury to answer "no" on the verdict forms if it unanimously agreed on the absence of the firearm enhancement. Accordingly, the trial court's instructions were improper. While the instructions were erroneous,

25

Berniard does not argue how his rights were actually affected at trial. He cannot show actual prejudice because the jury was still free to reject the firearm enhancement. Further, the jury returned "yes" verdicts on each special verdict form, showing that the jury found that the State met its burden of proof. Therefore, Berniard fails to raise a manifest error affecting a constitutional right.

Berniard attempts to portray his claim as a constitutional error by arguing that the trial court's instruction constituted an improper comment on the evidence presented at trial. However, Berniard's argument fails because an instruction improperly comments on the evidence only when it resolves an issue of fact that should have been left to the jury. *State v. Becker*, 132 Wn.2d 54, 64-65, 935 P.2d 1321 (1997). While the jury was not instructed that it could unanimously answer "no" on the special verdict forms, it was permitted to leave the forms blank if it did not unanimously agree to the enhancement. Accordingly, the trial court did not suggest that the jury did not need to consider the firearm enhancements, and it left the issue of fact to the jury.

In addition, Berniard's argument that the instruction lowered the State's burden of proof is unpersuasive. Berniard argues that the instruction lowered the State's burden of proof because it presumed his guilt. Notwithstanding the trial court's failure to require the jury to unanimously determine the absence of a sentencing enhancement, the jury was required to answer "yes" to the special verdict form if its decision was unanimous and found beyond a reasonable doubt. Accordingly, the State retained its burden to prove the enhancement unanimously and beyond a reasonable doubt.

No. 47726-2-II

In conclusion, Berniard fails to raise a manifest error affecting a constitutional right, and we do not review this claim of error.

## VII. APPELLATE COSTS

In his reply brief, Berniard asks that we refrain from awarding appellate costs against him. Under RCW 10.73.160(1), we may order adult offenders to pay appellate costs. However, we have the discretion to waive appellate costs. RAP 14.2; *State v. Sinclair*, 192 Wn. App. 380, 389-90, 367 P.3d 612 (2016).

The trial court found that Berniard was indigent. We must presume under RAP 15.2(f) that he remains indigent "throughout the review" unless the trial court finds that his financial condition has improved. Therefore, we exercise our discretion to waive appellate costs.

We affirm Berniard's convictions and waive appellate costs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Maxa, A.C.J.

_____
Sutton, J.

27